Fletcher HANKS, Jr.

v.

Harrison ROSS, William J. Roe, Jr., Roland H. Gernert, William Wyatt, Wesley Thompson, Garrett Ruth, and Orem Lowery.

Raleigh C. WILLIAMS, Sanford A. Williams, Dell Williams, Thawley Parks, George A. Whitely, and Herbert Thomas

v.

Fletcher HANKS, Jr.

Civ. A. Nos. 10418, 11084.

United States District Court
D. Maryland.

Dec. 22, 1961.

606

John F. King, Anderson, Barnes, Coe & King, Baltimore, Md., Dwight B. Galt, Washington, D. C., of Counsel, for Fletcher Hanks, Jr.

Charles B. Levering, Niles, Barton, Gans & Markell, Baltimore, Md., Karl W. Flocks, Washington, D. C., for Harrison Ross and others.

R. DORSEY WATKINS, District Judge.

Fletcher Hanks, Jr. is the owner of United States Patent to Heden No. 2,-288,701, "Shell Food Gathering Apparatus," and United States Patent to Hanks No. 2,672,700, "Shellfish Harvesting Machine." Hanks filed suit against Harrison Ross, William J. Roe, Jr., Roland H. Gernert, William Wyatt, Wesley Thompson, Garrett Ruth and Orem Lowery for infringement of the Heden patent and the Hanks patent. Ross, Roe, Wyatt, Ruth and Lowery answered denying validity of the patents in suit and any infringement of said patents. They also counterclaimed for a declaratory judg-

1. Raleigh C. Williams, Sanford A. Williams, Dell Williams, Thawley Parks, George A. Whitely and Herbert Thomas.

ment that the patents in suit were invalid and not infringed by counterclaimants and to recover treble damages, attorneys' fees and costs arising out of Hanks' alleged violation of the anti-trust laws. Injunctive relief against continued violations of the anti-trust laws and against the suing of any of the counterclaimants by Hanks for infringement likewise was sought. Thereafter, certain other Maryland clam fishermen [1] instituted a separate suit for a declaratory judgment that the Heden and Hanks patents were each invalid and not infringed by their particular clam digging rigs. They too sought injunctive relief and damages due to Hanks' alleged violation of the anti-trust laws. Hanks answered and counterclaimed for injunctive relief, damages and a declaratory judgment that Williams, et al. were infringing the Heden and Hanks patents. Pursuant to a pretrial conference agreement and order, the two cases were consolidated for trial. For clarity, hereinafter the patentee, Fletcher Hanks, Jr., will be referred to as the plaintiff and all other parties as defendants. Named defendants Roland H. Gernert and Wesley Thompson were not represented by counsel. From the earlier case in this court of Hanks v. Gernert, et al., Civil Action No. 8338, it would appear that Roland H. Gernert settled his differences with the plaintiff. However, counsel for plaintiff, during the pendency of the instant suit, served notice on Gernert that plaintiff would move for a default judgment, Gernert having filed no answer. Counsel for plaintiff also served notice that he would move for a default judgment against Wesley Thompson who had filed no answer. The whereabouts and Business of defendant William Wyatt is at the present time unknown to defendants' counsel. Defendant Roe settled his differences with plaintiff for the sum of $68.14 "to be rid of the matter" and plaintiff "asked to have Roe's name dropped from the suit." [2]

2. Hanks testified that he settled with Roe for $66.67 payable each year until the Hanks patent expires in 1971. To re-

## The Role of Plaintiff in Maryland's Soft Shell Clam Digging Industry

Hanks, who was born and grew up in the tidewater area of the Eastern Shore of Maryland, was thoroughly familiar with the practices of fishermen and oyster and clam harvesters in this area. As fishing and oystering operations were the most profitable, little attention was paid to the harvesting of soft shell clams, or manninoes, which were used mostly for bait; seldom, if ever, being consumed as food for human beings. Plaintiff was graduated from college about the time of the second World War. He was of military age and served throughout the duration, mostly in the Far East. At the end of the war he returned to the United States. He then learned that soft shell clams or manninoes were considered a delicacy and were in extreme demand in New England as well as in New York, Philadelphia and Atlantic City. New England and New Jersey clam beds were dying out, or at least were unable to meet the expanding market. Thus prices for clams in those areas were higher than those for oysters and other types of shell fish. Having personal knowledge of the rich deposits of soft shell clams on the Eastern Shore of Maryland, Mr. Hanks undertook to harvest soft shell clams in quantity by some means other than the laborious task of manually operating shovels and rakes, the theretofore only existing manner of harvesting the shell fish. Raking was singularly unsuccessful for harvesting on a commercial scale as Maryland's small tides limited clamming by hand. The majority of Maryland's clams do not lie exposed by a falling tide but instead are buried in the sand under several feet of water. About the time of Mr. Hanks' return to the Eastern Shore the soft shell clammers of Maryland were attempting to meet the problem of harvesting by moving their boats into relatively shallow water, casting anchors in divergent directions off the stern of the boat and draping a net in a substantial semi-circle behind the boat to collect clams dislodged by the boat propeller as the propeller was rapidly rotated. When the net became full the clammers would go overboard and haul it up to remove those clams which had been driven into it. This operation was not successful for a number of reasons. The net would be filled with mud, stones and other debris dislodged from the stream bottom thus making a heavy and worthless load for the fishermen to handle. Secondly, this method of harvesting resulted in many deep holes in the stream bottom being caused by the rapidly rotating boat propeller. Such holes often led to accidents and sometime even to the death of persons wading, swimming or crabbing in the areas where these operations had occurred. Accordingly, the State Legislature enacted a statute prohibiting further operations of this kind.

Being aware of the hydraulic jet principle of mining and other earth removing operations, Mr. Hanks conceived the idea that this hydraulic principle could be utilized to harvest soft shell clams. He began his experimentation with clam rigs in 1947, using a caterpillar tractor on which was mounted a centrifugal pump to supply hydraulic jets for excavating a clam bed and driving the clams into a scoop behind which was a collecting bag. With this rig he was able to operate in clam beds lying thirty inches deep in water. Thereafter with the aid of a blacksmith, and at some considerable expense, he built his first experimental clam dredge in July of 1949. This rig consisted of a dredge mounted on a boat with a manifold with jets, and below the jets, a scoop and rearwardly of the scoop, a net. Using this rig Hanks shipped his first clams to Shelter Island Shellfish Company in the Fulton Fish Market in the summer of 1949. In 1950, Hanks made a sketch of his clam dredge, outlining the principal elements as being a manifold joined by two parallel runners which supported a scoop therebelow and

solve any conflict as to the amount of the settlement is not necessary as it is agreed, and is the only relevant fact in this connection, that Roe is no longer a defendant in this litigation.

hydraulic jets for excavating the clams from the bottom of the bed and moving them up the scoop into the net. The position of the runners was made adjustable in that there were means provided for varying the distance from the bottom of the scoop to the runners. Hanks testified during the trial that after this rig was in use he went to his present patent counsel in January 1950 to ask counsel if this was a patentable device. A search on the 1950 device was made and counsel reported that it was not patentable because "he [counsel] said there was a lot of prior art", "there are a lot of clam catching apparatuses" and he "revealed that there were prior patents." [3]

Hanks was shipping clams commercially but according to his own testimony his commercial operations were "nip and tuck" until 1952. In 1952 instead of using a net for collecting the clams dislodged by the jets, Hanks substituted a conveyor. The conveyor was "conventional" and "as simple as could be." [4] This substitution and other small refinements made Hanks' rig a commercial success. Joseph Henry Gernert, a waterman all of his life, in testifying on behalf of plaintiff Hanks stated that upon seeing the success of Hanks' device he spent his entire life savings of $2,800 trying to copy the Hanks' rig. Gernert elucidated as follows: "So, I imagine I had bought up and burned up and sawed up a truck load of iron trying to make a rig with wheels and with smaller water pumps. My brother said why fool around. We are wasting so much money. He said that he would go down to the Miles River Neck, where Mr. Hanks' rig was tied, and he said that he would get the measurements from it; he won't

know nothing about it, because I will go after dark.

"We came to an agreement, and that is what happened. He went and got the measurements from his rig, and then we soon had one like it. We got out there, and I think the first day we dug 20 bushels of manninoes, and we were both very tickled." [Transcript, pages 88–89]. "So we continued with the operation, and then when I made a success of it, then my brother, he got one, and the other brother got one, and sometimes they would be waiting for me to get ashore to get the measurements off of mine so that they could build one, and that is how the Queen Anne's County came into the operation." [Transcript, pages 89–90].

As the Maryland soft shell clam industry came into being and prospered, there was a corresponding drop in the oyster industry.[5] Specific scientific studies were initiated to evaluate the effects of hydraulic clam dredging on oysters, fish, crabs and other tidewater resources. As a result of such studies an interim report on the Maryland soft shell clam industry,[6] entitled "Resource Study Report No. 11", was submitted to the Maryland General Assembly in January 1957 by the State of Maryland Board of Natural Resources which in addition to other data shows the rapid development of the Maryland clam industry from 1952 on. The total number of licensed soft shell clam dredges in Maryland was seven in 1952; thirty-one in 1953; thirty-six in 1954; eighty-five in 1955; and ninety-three in 1956. The dockside value of the total catch in a given fiscal year based on a value of $4.00 a bushel had grown from virtually nothing prior to 1952 to $580,-

3. Testimony of Hanks, transcript, pages 283, 284.

4. Testimony of Hanks, transcript, page 464.

5. If a noisy noise annoys an oyster, the oyster's annoyance was as nothing when compared with the feelings aroused in the Maryland oystermen by the arrival in Maryland waters of the huffing, puffing clam dredge with its three engines—the pump motor, the conveyor motor and the boat motor—continuously in operation while dredging. Equally irate, and joining on the side of the oystermen against the clammers, were those engaged in crabbing, fishing and duck hunting. These claimed that water grass and natural feed was damaged, and that mud was deposited upon, and killed, oysters.

6. Plaintiff's exhibit No. 12.

000 in 1956, with a predicted value of $720,000 in 1957. Mr. Hanks testified that the industry grew from a crop of five thousand bushels or a dockside value of $20,000 in 1952 to a harvest of one-half a million bushels or a dockside value of $2,000,000 in 1960. Were the clams to be further processed by shucking, breading, precooking, freezing and portion-packaging the value of the harvest would be between four and a half and five million dollars. There is no doubt that the coincidence of the New England shortage of soft shell clams and the direct copying of the Hanks rig by other Maryland clam fishermen was responsible for the rapid growth of Maryland's soft shell clam industry.

## Patents in Suit

When suit was first filed by plaintiff, the complaint alleged infringement of both the Heden and Hanks patents without limitation as to any specific claims therein. At the time of the pretrial conference plaintiff withdrew claims 2, 3, 4, 5, 9, 10, 11 and 13 of the Heden patent and claims 1 through 3 and 5 through 12 of the Hanks patent. At the opening of the trial plaintiff withdrew the Heden patent claim 12 and the Hanks patent claim 4. With respect to the withdrawn claims, defendants moved for a declaratory judgment that their rigs did not infringe said claims. The court reserved ruling upon this motion. When plaintiff submitted a brief after trial, the remaining claims of the Heden patent were not even cursorily discussed in the said brief. It is not at all clear to the court that the plaintiff has not abandoned entirely that part of the suit based on alleged infringement of the Heden patent. Although in plaintiff's reply brief to defendants' brief after trial, counsel for plaintiff does mention the Heden patent, it is primarily to show that infringement of the Heden patent was honestly urged in the beginning of the case and not intended as a harassment of defendants. Plaintiff did not even offer the Heden patent in evidence. It remained for defendants' counsel to introduce the Heden patent into evidence as defendants' exhibit FF. Defendants argue, and with some merit, that plaintiff has actually abandoned any reliance on the Heden patent. However, since the matter is not entirely free from doubt, the court will proceed to discuss the four claims of the Heden patent that were in issue during the trial.

Heden No. 2,288,701—Shell Food Gathering Apparatus. Filed March 23, 1940, issued July 7, 1942; assigned to Hanks.

The elements claimed in Heden's patent are (1) a conveyor mounted on a supporting device, either a ship hull or a barge (2) with a scoop (a) mounted adjacent the receiving end of the conveyor or (b) supported so that it discharges onto the conveyor, (3) in combination with (a) means mounted on the scoop for projecting jets at and directed from the mouth towards the rear of the scoop along its bottom *wall* or (b) means in the scoop for progressing material picked up by the scoop from its receiving to its discharge and or (c) pressure fluid means for moving materials picked up by the scoop from its receiving to its discharge end or (d) a plurality of nozzles mounted in the scoop and arranged to discharge towards the rear end of the scoop. The claims in suit are set forth in their entirety in footnote No. 7. The

7. Claim 1.
"In an apparatus of the type described, a support comprising a ship hull, a conveyor mounted on said support so as to extend below it, a scoop mounted adjacent the receiving end of the conveyor, and means mounted on the scoop for producing high velocity fluid jets at and directed from the mouth towards the rear of the scoop along its bottom wall."

Claim 6.
"In a sea food dredging apparatus the combination including a barge, a conveyor mounted on said barge so that the lower end thereof is adjacent the bed of the body of water in which the barge floats, a scoop supported so that it discharges onto the conveyor, and means in the scoop for progressing material picked up by the scoop from its receiving to its discharge end."

references cited [8] against the Heden patent during its prosecution through the Patent Office were: Eads No. 196,645—Dredging Apparatus—Issued 1877; Stone No. 281,415—Hydraulic Excavating Machine—Issued 1883; Lybeck No. 1,070,271—Oyster Dredging Machine—Issued 1913; Emmons No. 1,168,293—Dredge—Issued 1916; Gage No. 1,270,-142—Gold Dredge—Issued 1918; Doxsee No. 2,116,883—Dredge—Issued 1938.

Eads discloses the combination of a cutting blade and agitating jets, the patentee alleging that his invention "consists in combining with the lower end of a suction-pipe, A, a scraper, B, to raise and collect the sand, earth, or materials to be dredged up" and "a system of pipes and nozzles, F, to direct jets of water from a forcing-pump onto the sand or material to be removed, so as to loosen and disintegrate the same." (page 1, column 1, lines 9–12, 18–21).

Stone teaches the use of a high velocity jet at the mouth of the implement directed toward the rear.

Lybeck is perhaps one of the most pertinent references, teaching the use of a gathering scoop mounted at the base of an elevating hull conveyor with an induced current, created by a hood, sweeping the oysters over the scoop onto the conveyor.

Emmons discloses the use of jets, the inventor describing his invention as consisting of "a dredge of cage-like structure, closed at top, *bottom* and sides and at one end, the other or front end being open and provided with sets of angularly disposed teeth or jet-tubes, some or all of which may be open at their outer ends and adapted to be supplied with water under pressure so that when the dredge is in operation the water will be discharged from said teeth or jet-tubes in streams in substantially intersecting planes, whereby the material of the sea or river bottom is displaced and this displaced material violently agitated and the shell-fish contained therein washed free of it and as the dredge is dragged forward deposited within the dredge * *" (page 1, column 1, lines 20–36, emphasis supplied).

Gage states "[a] further object of my invention is to provide in a dredge of this character means whereby disintegrating jets are directed against the ore-bearing material in front of the head in such a manner that they will cooperate with mechanism carried on the head itself, whereby to disintegrate the material in front of the head to permit ready passage of the ore-bearing material through the head itself." (Page 1, column 1, lines 37–46).

Doxsee reveals the combination of a conveyor mounted in the well of a float and means for locking a scoop with a continuous bottom wall, two side walls and a front edge in various pivoted positions and jets which wash the clams just before they reach the top of the conveyor.

The examiner first rejected claims 1, 6 and 7 on the patent to Lybeck. Claim 8 was rejected on patent to Lybeck in view of patents to Eads and Doxsee.

Claim 7.
"In a sea food dredging apparatus the combination including a barge, a conveyor mounted on said barge so that the lower end thereof is adjacent the bed of the body of water in which the barge floats, a scoop supported so that it discharges onto the conveyor, and pressure fluid means for moving material picked up by the scoop from its receiving to its discharge end."

Claim 8.
"In a sea food dredging apparatus the combination including a barge, a conveyor mounted on said barge so that the lower end thereof is adjacent the bed of the body of water in which the barge floats, a scoop supported so that it discharges onto the conveyor; a plurality of nozzles mounted in the scoop and arranged to discharge towards the rear end of the scoop, and means for supplying fluid at high pressure to said nozzles."

8. No references at all are printed on the patent itself as such was not the procedure in the Patent Office at the time of the issuance of the Heden patent. However, an examination of the file wrapper discloses the patents which were considered and listed as references during the prosecution of the Heden application.

After amendment of certain claims the examiner for the second time rejected the claims in suit on the basis of patent to Lybeck in view of patent to Stone. A third time the examiner rejected claims 1, 6, 7 and 8 on patent to Lybeck in view of patents to Stone or Gage. In response to a request for a reconsideration the examiner for the fourth and final time rejected the claims in question on the basis of the patent to Lybeck in view of the patents to Stone or Gage. Upon appeal the Patent Office Board of Appeals reversed the examiner and allowed the claims. It stated in part the "invention is an apparatus for gathering shell food from river and ocean beds. It comprises a ship hull, an inclined conveyor extending through the hull towards the bed and a scoop at the forward end of conveyor. The conveyor and scoop are adjustably mounted so they can be adjusted to suit different depth [sic] of water where the beds are located. As the ship moves slowly forward the shells and mud pass over the scoop to the conveyor. *The structure thus far recited is conventional.* Appellant has made an improvement by providing fluid pressure jets in the scoop which are directed rearwardly. The fluid [sic]. from these jets aid [sic] in forcing the shells over the surface of the scoop to the conveyor and also serve to clean the shells." In distinguishing the jets disclosed by Stone or Gage the Board of Appeals went on to say that the "purpose of the jet [of Stone or Gage] is to direct material towards the front end of the suction nozzle. Obviously, in neither one of these references is there a scoop employed and fluid jets arranged to direct fluid rearwardly over the scoop to move material such as shells over the scoop and clean the same. * * * We believe that appellant has made a meritorious improvement in this art and that *the appealed claims are limited to this improvement* and may be allowed." (Emphasis supplied.)

### Validity of Heden Claims in Suit

Title 35, § 282 of the United States Code provides that a "patent shall be pre-sumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." This burden has been said to be "a heavy one, as it has been held that 'every reasonable doubt should be resolved against * * *'" the party asserting invalidity. (Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983). While in some cases it may be "as reasonable to conclude that a prior art patent not cited was considered and cast aside because not pertinent, as to conclude that it was inadvertently overlooked" (Artmoore Company v. Dayless Manufacturing Company, 7 Cir. 1953, 208 F. 2d 1, 4, cert. den. 1954, 347 U.S. 920, 74 S.Ct. 518, 98 L.Ed. 1075), the Court of Appeals for the Fourth Circuit has stated that when the earlier patents not cited by the Patent Office "unquestionably constitute a most important part of the prior art, the presumption of validity arising from the grant of the patent is greatly weakened. Maibohm v. R. C. A. Victor Company, 4 Cir. 1937, 89 F.2d 317". (Gillette Safety Razor Company v. Cliff Weil Cigar Company, Inc., 4 Cir., 1939, 107 F.2d 105, 107).

One of the most important patents not cited by the Patent Office was Gage No. 1,164,492 filed March 19, 1915 and issued December 14, 1915 covering a "clam digger and fishing machine." The patent states "The slotted portion of the plow or dredger nozzle practically outlines the scope of digging operation of the machine as the machine is propelled along its course. The water under pressure from the pump 40 is delivered through the standpipe 47, a portion of the water being jetted from the plow slot 50, loosening up the bed of sand to the desired depth and hence setting the clams therein substantially free, and such loose sand and clams are delivered between the legs of the standpipe and over the horizontal portion of the plow 48. Such delivery is facilitated by a series of movable nozzles 52 extending forwardly at their upper ends from a pipe 53 communicating with the legs 47 of the standpipe. These nozzles 52 are connected by movable

joints 54 to the transverse pipe 53 around which they are adapted to oscillate laterally as shown by full and dotted lines in Fig. 4, such movement being around a horizontal axis parallel to the direction of movement of the machine. Each of these nozzles extends forwardly and downwardly, terminating in an open end *directed rearwardly at or about the upper surface of the bed of sand. That portion of the water under pressure from the point of delivery through the nozzles 52 serves to drive the sand and clams over the plow 48.*" (Page 2, column 1, line 57 to column 2, line 87; emphasis supplied). Thus, the teachings of Gage's clam digger and fishing machine include not only disintegrating jets but also the use of jets to force the shells over the surface of the plow or scoop and onto the endless carrier or elevator, the "invention" specifically claimed by Heden.

Davis No. 625,543 filed April 9, 1898 and issued May 23, 1899 relating to a "clam dredge" likewise was not cited by the Patent Office. The specifications state "this invention relates to mechanical means for removing clams * * * from the beds of rivers * * * " and in "accordance with this invention a boat, vessel, * * * or suitable float is provided * * * " (Page 1, column 1, lines 7-9, 13-14). "An elevating apparatus is mounted upon the boat and operates through the opening thereof and is capable of rising and falling, so as to adapt itself to the depth of the river * * * " (Page 1, column 1, lines 17-20). "The shovel, or scraping-blade 9 is provided with side pieces formed by bending side portions of the plate from which the shovel is constructed, * * * " (Page 1, column 2, lines 95-98). "An upwardly and rearwardly inclined conveyor 16 is interposed between the lower portion of the elevator and the rear end of the shovel 9 * * * and conveys them to the elevator." (Page 2, column 1, lines 14-19). "An agitator 17 is located in advance of the scraper and is a toothed cylinder or roller and is of a length approximating the width of the scraper, so as to loosen the shells in advance of the scraper and insure a proper delivery of the shells to the shovel when the apparatus is in operation." (Page 2, column 1, lines 28-35).

Claim No. 6 of Heden clearly reads on Davis as was admitted by Hanks in his testimony [9] with the qualification that "means for progressing material picked up by the scoop from its receiving to its discharge end" were not provided *within* the scoop. The specifications support this interpretation of the patent. The importance of this qualification will be emphasized later when the question of infringement is discussed, as the structure of the accused devices forces the plaintiff to take the position either that Heden reads on Davis without qualifications, and therefore claim No. 6 of Heden is invalid, or that the accused devices do not infringe claim 6 of Heden.

British Patent No. 150,015 entitled "Improved Process and Apparatus for Dredging", granted August 23, 1920 not cited by the Patent Office, reads on claim 7 and claim 8. "Such a dredger will lift mud or other deposit from the bed of a river or * * * corn or other such like material from the hold of a ship or other source of supply * * * " (Page 1, column 1, lines 27-31, provisional specification). "I prefer to sling the dredger body upon chains * * * or a barge behind which my dredger body would be towed and into which the material dredged may be discharged." (Page 2, column 2, lines 70-76, provisional specification). "I may discharge the contents of the dredger body through a connection at its

---

9. "A. (Hanks) Yes, that is correct. Davis reads upon Heden or Heden reads upon Davis in the respect that both of them are barges and both of them have conveyors mounted on the barge so that the lower end thereof is adjacent the bed of the body of water in which the barge floats.

"Q. So the element of the scoop supported so that it discharges onto the conveyor is also in Davis. A. (Hanks) Correct." (Testimony of Hanks, transcript, page 416).

lower extremity attaching the discharge pipe thereto and bringing this pipe up to a desired height and supporting it suitably, or I may bring my discharge pipe directly upwards * * * *I may make use of air or and water jets at such a pressure that they will when discharging into the open mouth of my delivery pipe and into suitable positions on the pipe itself induce an upward current which will help to drive out the material from the dredger body."* (Page 2, column 1, lines 27–44; emphasis supplied). "This material will gravitate into the dredger body, or it may be scooped into it by suitable means * * *" (Page 1, column 1, lines 15–17). "* * * and I may facilitate the entry of the material by mechanically operated fittings for scooping it in or by using water or air jets which by being brought to bear upon the material will loosen it and tend to drive it into the mouth of the dredger body." (Page 1, column 1, lines 20–26).

The provisional specifications disclose the use in combination of a barge, a conveyor or discharge pipe mounted on the barge, scooping the material to be dredged into the dredger body and the use of jets not only to disintegrate the material to be dredged but also the use of jets (1) to drive said material into the mouth of the dredger body and (2) to move said material picked up by the suitable scooping means through the dredger body.

The court finds that mere mechanical skill only would be required to substitute the well-known nozzle construction for progressing material picked up by the dredger as taught in the Gage Patent No. 1,164,492 or in the British Patent No. 150,015 for the induced current created by a hood as taught in the Lybeck Patent No. 1,070,271 should Lybeck's induced current not be sufficiently strong to sweep the shell food over the scoop and onto the conveyor. Heden is a mere aggregation of well known elements, which together perform or produce no new or different function or operation than previously performed by them individually. In considering whether or not the Heden patent is an aggregation or a combination the court has not been unmindful of the severe test which the patent in suit must pass to establish validity as that test is laid down in Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corporation, 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, since the Fourth Circuit has held that the principle set forth in that case has not been changed by the revision of the Patent Laws in 1952. Interstate Rubber Products Corporation v. Radiator Specialty Co., Inc., 4 Cir., 1954, 214 F.2d 546, 549; Gordon Cartons, Inc., v. Alford Cartons, 4 Cir., 1954, 218 F.2d 246, 250; Pollard v. American Phenolic Corporation, 4 Cir., 1955, 219 F.2d 360, 363; see also, Todd v. Sears, Roebuck & Co., 4 Cir., 1954, 216 F.2d 594, 596. Accordingly, in view of the prior art this court holds claims 1, 6, 7 and 8 of Heden invalid. However, were these claims valid they would not be infringed by defendants' rigs.

### The Accused Rigs

Prior to trial defendants submitted to plaintiff under Rule 36 of the Federal Rules of Civil Procedure, 28 U.S.C.A. identical schematic sketches of their individual clam digging apparatus which in each case consisted of a manifold-fed series of jets for jetting a hydraulic stream against a river bottom *in advance of a narrow directing baffle* to the rear of which, and in spaced in relation thereto, was an upwardly directed conveyor. The opening between the directing baffle or "blade" and the conveyor permitted stones and other heavy material to be redeposited upon the river bed while the clams, being substantially lighter than such material, were carried upward by the conveyor. Side plates which supported the "blade" and the manifold for the jets were in turn supported by a block and tackle adjusted from the deck of the boat so that the jets would agitate only to a depth corresponding to the depth of the clam bed. In response to defendants' request for an admission that these schematic sketches were a true representation of the accused devices,

plaintiff answered that the rigs used by the defendants Lowery, Ruth, Roe and Ross were, at the time of the bringing of this action, in precise accordance with the sketches submitted. Thereafter, during trial, defendants offered into evidence a one-half intact side section of a worn hydraulic rig head described by plaintiff as being a typical Chesapeake Bay area clam digging rig. It was further agreed by counsel that the rig was representative of the rigs of each of the defendants in this litigation. In addition, a sketch of the typical defendants' rig or the "Chesapeake rig" was admitted into evidence to show the construction of the accused devices. In comparing said rigs with Heden the following distinctions would appear. First, should it be considered that defendants' blade supported by side plates constitutes a scoop, there are no means mounted on or means in the defendants' scoop for progressing material picked up by the scoop through the scoop. As previously noted in this opinion plaintiff admitted that Heden clearly reads on Davis with the qualification that "means for progressing material picked up by the scoop from its receiving to its discharge end" were not provided *within* the scoop. It became apparent during the trial that the jet nozzles of the accused rigs and the jets produced therefrom are always forward of the blade under plaintiff's own analysis of the Heden patent.[10] The validity of Heden could not therefore be sustained without, at the same time, admitting that the accused rigs did not infringe.

During the course of the prosecution of the Hanks patent in the Patent Office, counsel for plaintiff called the examiner's attention to the prior patent to Heden, desiring said patent to be made of record to show that it had been considered by the examiner. In distinguishing Hanks from Heden, plaintiff's present patent counsel made the following statement in regard to then claims 18 and 19 which became claims 13 and 14 of the Hanks patent now in suit:

" * * * Claims 18 and 19 as now presented clearly emphasize the structure by which the applicant's beneficial results are obtained and clearly avoid the Heden patent. It will be observed that the scoop of the applicant's invention, as defined in claim 18, has its forward edge disposed below the runners and rearwardly of the forward ends of the latter. This clearly departs from any construction that can be reasonably placed upon the Heden patent. Heden's scoop is always *forwardly* of the conveyor and is actually supported by the conveyor frame as distinguished from the runners. Claim 18 also points out that the conveyor frame is connected at its forward end *in the rear end* and above the bottom of the scoop. In Heden, the conveyor frame and the conveyor carried thereby is not in the scoop but is located below the latter. The nozzles of the applicant's machine project their jets downwardly and rearwardly so that some of the streams strike the river bottom in advance of the scoop edge. In Heden, the jets are *carried by the scoop* and are never projected ahead of the advancing edge of the scoop." (Emphasis of attorney prosecuting patent).

Although this court is fully cognizant of and bound by Circuit Judge Soper's admonition in Denominational Envelope Company v. Duplex Envelope Company, 4 Cir. 1935, 80 F.2d 186, 192, 193, that solicitors' arguments, during the prosecution of a patent, of themselves set up no file wrapper estoppel, and that the Fourth Circuit declines "to consider what

---

10. "Q. In other words, Mr. Hanks, as you interpret the Heden patent, anything forward of the blade is not in the scoop. A. That is right.

"Q. So that when we are talking about the Heden patent, talking about Defendants' Exhibit Y, the part that I have my hand on, which is the manifold and the jets, that is not in the scoop. I am talking about Heden. A. Right."

was said arguendo during the passage of the case through the Patent Office, or any other of the preliminary negotiations which the patent itself was intended to subsume * * *", this court has considered the quoted passage from the Hanks file wrapper, not for the purpose of establishing an estoppel against plaintiff as to the Hanks claims, but instead for the limited purpose of determining what plaintiff and his present patent counsel understood in 1954 to be the construction disclosed by Heden. Again, it is perfectly clear that the accused rigs do not by plaintiff's own analysis of the Heden patent infringe Heden, an analysis with which the court is in complete accord.

Secondly, as to infringement the jets in the accused rigs are not directed along the scoop's bottom wall if there is indeed a scoop construction used in defendants' rigs. Thirdly, it appears dispositive to this court on the issue of infringement that the accused devices, as in the Hanks device, have the cutting of the river bed done exclusively by hydraulic means. Neither the sides nor the blade have any function as far as cutting is concerned. The testimony is uncontradicted as to this matter. The following colloquy took place between the court and counsel for plaintiff Hanks relative to the Hanks disclosure during the opening statement of plaintiff.

"The Court: Do you need a blade?

"Mr. Galt: Yes, there is a blade. There is a blade used at the bottom of the scoop, which was inclined in an upward direction, so that the force of the water would elevate the more buoyant clams over the blade and into the path of the following scoop, there to be carried up to the conveyor and picked off at the rear end.

"The Court: Does the blade perform any digging function?

"Mr. Galt: No. The blade performs no digging function."

During the trial plaintiff, in describing how his rig and the "typical Chesa-peake Bay rig" operated, responded to the Court's questioning as follows:

"The Court: As I understand it, if the operation is properly conducted, the blade performs no cutting function.

"The Witness: Absolutely none.

"The Court: That would defeat its purpose in part if it did, because it would tend to crush the clams in the course of attempting to dig them up.

"The Witness: That is correct.

"The Court: So the blade then is solely for the purpose of directing the flow so as to assist in floating or raising the clams and getting them to go far enough back to be taken on to the conveyor."

This method of operation should be contrasted with that disclosed by Heden. There the cutting is done by the cutting head or scoop, the function of the jets being solely to prevent the head from becoming clogged. This is evidenced by the frequent reference in the patent to *a scoop cutting the ocean bed*. The specifications recite "a scoop * * * for dislodging the shell food from the bed of the ocean" (Heden, page 1, column 1, lines 8–10); "[i]t is one of the objects of this invention to improve the operation of dredges of the type disclosed in United States Letters Patent No. 2,116,-883, [Doxsee] issued May 10, 1938. In the operation of apparatus as shown in that patent the portion of the ocean bed which is sheared off by the scoop * * is pushed along the scoop only by reason of the travel of the dredge * * *"; "[i]t may be stated as an object of this invention to provide an improved method of moving of the shell food through the scoop and onto the conveyor while disposing of all or substantially all of the sand, dirt and other parts of that portion of the surface of the ocean bed which is sheared off by the scoop" (page 1, column 1, lines 35–44, lines 51–57); and "[i]n apparatus as disclosed in the above-mentioned patent [Doxsee] the portion of the ocean bed which is sheared off by the

scoop * * * " (Heden, page 1, column 2, lines 11–13). Analyzing the result of the improvement disclosed by his patent, Heden states "the scoop is substantially always in the condition as illustrated in Figure 1 of the drawings, a condition which only exists at the very beginning of the shearing action in the use of the scoop of the above patent [Doxsee]." (Page 1, column 2, lines 23–28).

Accordingly, for the aforesaid reasons the court holds that claims 1, 6, 7 and 8 of Heden if valid are not infringed by the accused devices.

Hanks—No. 2,672,700—Shellfish Harvesting Machine, Application filed May 19, 1952, Issued March 23, 1954.

In brief, the two claims of the Hanks patent in suit embrace the combination of (1) a pair of runners to travel along a stream bottom, (2) a scoop carried or supported by the runners with said scoop's (a) forward edge, or (b) forward blade member disposed below and rearwardly of the forward ends of the runners, (3) a conveyor frame (a) hingedly connected at the rear end of, and above the bottom of, the scoop or (b) otherwise communicating with the rear end of the scoop and (4) jet nozzles (a) supported by the runners in advance of the scoop to project jets forwardly of and into the scoop or (b) disposed transversely of the scoop in advance of and above the blade. The claims in suit are set forth in their entirety in footnote number [11]. The references cited against the Hanks patent during its prosecution through the Patent Office were: Collier No. 897,351—Clam Digger—issued 1908; Lybeck No. 991,333—Oyster Dredging and Manipulating Machine—issued 1911; Frissell No. 1,486,485—Shrimp Catching Device—issued 1924; Heden No. 2,288,701—Shell Food Gathering Apparatus—issued 1942.

The use of nozzles disposed transversely of the scoop member is suggested by the Collier patent. The specifications of that patent state that in order to "loosen the mud from the clams removed by the digger fingers, a U-shaped pipe frame 34, may be secured transversely above the digger-wheel frame, with its horizontal pipe 35 parallel with and immediately above the digger-wheel 10, and provided with a plurality of spray openings 36 for jetting a fluid downwardly upon the material carried between the digger fingers, said pipe 38 being provided with a jetting fluid from a supply pipe 37, which may be secured upon the conveyor frame adjacent the upper end thereof, and connected to the pipe frame 34 by a flexible hose or the like 38." (Page 2, column 1, line 55—column 2, line 68).

Lybeck teaches the use of a gathering scoop embodying a floor and side pieces connected by an inclined body portion forming the bottom of the scoop. Extended between the side pieces are shafts upon which rollers are mounted, their function being to carry the scoop. Pivot-

---

[11]. Claim 13.

"In a shell fish harvesting machine, a pair of spaced parallel interconnected runners to travel along and rest upon a stream bottom, a scoop carried by and having its forward edge disposed below said runners, the said forward edge of said scoop disposed rearwardly of the forward ends of said runners, a conveyor frame hingedly connected at its forward end in the rear end and above the bottom of said scoop, nozzles supported by said runners in advance of the forward ends of said scoop, said nozzles directed downwardly and in a rearward direction to project jets forwardly of as well as into said scoop, and means for supplying fluid under pressure to said nozzles."

Claim 14.

"In a shell fish harvesting machine, a pair of spaced parallel runners to rest upon and travel along a stream bottom, a scoop interposed between and supported by said runners, a blade member at the forward end of said scoop disposed transversely between said runners with its forward edge disposed rearwardly of the forward ends of said runners and with said edge disposed a predetermined distance below the latter, conveyor means communicating with the rear end of said scoop to receive material therefrom, nozzles disposed transversely of said scoop in advance of and above said blade, and means for supplying fluid under pressure to said nozzles."

ally mounted on a shaft extended between the side pieces is a reel with free arms— the free ends of which are spaced sufficiently close to engage the usual medium sized oyster. The rotary path of the ends of the arms sweeps the ocean floor slightly in advance of the forward edge of the scoop thereby elevating or tossing backward the oysters upon the bottom of the scoop and tossing them therefrom onto the conveyor which is mounted on an elevator. Thus, in Lybeck there is a disclosure of the use of an agitator, a scoop and a conveyor attached to the scoop to elevate the oysters from the scoop, which is adjacent to the river bottom, to a barge or boat. The conveyor frame is hingedly connected to the rear end of the scoop and the conveyor in said frame has its forward end disposed in the rear of the scoop.

Frissell is irrelevant as a reference as it deals with the use of an "apron" in a clam digging device, an element in one of the claims of Hanks that has been abandoned in the instant suit as to the issue of infringement.

Heden requires no further discussion.

### Validity of Hanks Claims in Suit

■■■ Again, recognizing that the burden of establishing invalidity of the Hanks patent rests on the defendants, that it is a heavy burden and that every reasonable doubt should be resolved against invalidity of the claims in suit, the failure of the Patent Office to cite patents unquestionably constituting a most important part of the prior art greatly weakens the presumption of validity arising from the granting of the patent. In addition, the principle of the Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corporation, 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, that the "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements" requires a consideration of the uncited prior art relative to the Hanks patent and likewise a determination is required of whether or not "the prior art are such that the subject matter as a whole would have been obvious at the time the [alleged] invention was made to a person having ordinary skill in the art * * * ". (35 U.S. C.A. § 103).

In the prior art of clam digging and dredging the use of (1) an all-hydraulic machine, (2) an all mechanical machine and (3) a semi-hydraulic machine combining hydraulic digging with mechanical conveying or collecting were generally known. The Hanks patent and the "Chesapeake rig" are in the class of semi-hydraulic dredges.

Phillips, Jr. No. 1,415,113, filed August 11, 1920 and issued May 9, 1922 teaches the use of an all-hydraulic "clam dredging machine" in which (accepting, as the court does, the description thereof by plaintiff), "air pressure is dispelled through a jet or nozzle below * * * a hollow shell * * * with a tube [extending] upward to the harvesting vessel, and by the forcing of air through this nozzle * * * bubble[s] the clams upward into this tube" (testimony of Hanks, transcript page 272). This tube or pipe may be made telescopic so that its lower end will follow the contour of the stream's bottom without disturbing the upper or discharge end. The principle of physics relied upon by Phillips for raising dislodged clams through the use of a rising column of water in a partially submerged vertical pipe by the discharge of air below or within the pipe is well known and is disclosed in the text books "Elements of Hydraulics" of 1912 (Defendants' exhibit—AA) and "Chemical Engineers' Handbook" of 1934 (Defendants' exhibit—BB).

Four other expired patents also not cited by the Patent Office against the Hanks patent are highly pertinent. They were previously discussed in this opinion in regard to the validity of the Heden patent but some repetition may be helpful. The expired patent to Eads No. 196,645, shows the use of an all-hydraulic "dredging apparatus" in which jets are used to agitate the stream bottom; gage plates which are the equivalent of run-

ners in that their function is to regulate the depth of the cut to be made by the scraper; a hydraulic conveyor provided with a telescopic joint so that the dredge head may be operated in an inclined position when the surface of the water is rough.

Davis No. 625,543, relates to a clam-dredge of the all-mechanical type, having a rotary brush agitator to sweep the clams into the forward portion of the shovel or scoop and then onto the conveyor-type apron, the clams thereafter being carried upwardly by a mechanical conveyor-elevator. As in the expired patent to Emmons No. 1,168,293, covering a "Dredge" the runners are curved upwardly at their forward end, Davis reciting that the purpose thereof is so that they may "pass over the bed with greater facility". In Davis the agitator is supported forwardly of the blade by the runners.

Gage No. 1,164,492, relative to a "Clam-Digger and Fishing-Machine" in a semi-hydraulic clam digger discloses the use of agitating jets in advance of the plow, or (scoop) which in turn is in advance of the conveyor. The patent recites:

"[a]t 20 I show any * * * supporting frame * * * supported * * * upon the bed of the water, the means * * * for such purpose including a set of wheels 21 [equivalent to runners] * * *" (page 1, column 2, lines 78 through 84; " * * * buckets will scoop into the mass of sand and clams previously loosened by the dredging devices [plow and dredging nozzles] and will lift the same" (page 3, column 1, lines 32–35); "[t]he lower end of the elevator thus has a substantially fixed relation to the plow or dredging nozzles 48, but these parts are all adjustable vertically, simultaneously by means of racks 74 and pinions 75." (Page 2, column 2, lines 115 through 119); "[a] pair of braces 80 and 81 are connected upon each pivot pin 73 and have slotted connection at their up-

per ends with hand clamps 82 whereby the standpipe is well braced in both directions in any position to which it may be *adjusted*." (Page 2, column 2, line 127 to page 3, column 1, line 3; emphasis supplied); "[t]he upper end of this carrier or elevator is mounted upon a shaft 69 journaled in fixed supports 70 on the sides of the frame, and the lower end of the elevator is journaled upon a shaft 71 whose position or elevation is determined by a pair of links 72 pivoted at 73 upon the outer sides of the standpipe legs 47." (Page 2, column 2, lines 108 through 115); and "[t]he water under pressure from the pump 40 is delivered through the standpipe 47, a portion of the water being jetted from the plow slot 50, loosening up the bed of sand to the desired depth and hence setting the clams therein substantially free, and such loose sand and clams are delivered between the legs of the standpipe and over the horizontal portion of the plow 48." (Page 2, column 1, line 61 to column 2, line 70).

The court concludes that all other prior art aside, Hanks' claim 13 and Hanks' claim 14 read on Gage No. 1,164,492 of 1915 taken alone.

Two other patents not previously mentioned require a passing analysis. Pike No. 532,183, filed December 1, 1894, issued January 8, 1895—Ore Sweeping and Recovering Device—and Lake No. 1,997,149, filed October 15, 1931, issued April 9, 1935—"Submarine Locating, Harvesting, and Recovery Apparatus".

Pike deals with the use of a jet or jets located in front of a brush to assist in sweeping or propelling ore to and up an incline, the equivalent of a scoop, or when desired using the pressure jets alone for effecting the sweeping or cleaning of the surface of the river bed or other mining bottoms below the water line.

Lake states "[b]y referring to Fig. 5 it will be seen that the propeller 11 * * * will produce a rapid current

substantially in the direction of the arrows * * * driving the upper particles forming the water bed upward and aft * * *" (page 3, column 2, line 68 to page 4, column 1, line 1).

The court concludes in view of the prior art that Hanks' claim 13 reads on Davis No. 625,543 of 1899 in view of either Pike No. 532,183 of 1885 or Lake No. 1,997,149 of 1935. Hanks' claim 13 also reads on the British patent No. 150,015 of 1920 in view of Lybeck No. 991,333 of 1911, said patents having been discussed when the validity of the Heden patent was considered previously in this opinion. In addition, Hanks' claim 13 reads on British patent No. 150,015 in view of Collier No. 897,351 of 1908. Hanks' claim 14 reads on British patent No. 150,015 of 1920 or on Davis No. 625,543 of 1899 in view of either Pike No. 532,183 of 1855 or of Lake No. 1,-997,149 of 1935.

■ Thus the court finds the claims in suit of the Hanks patent to be invalid. The court reaches this conclusion somewhat reluctantly in view of the fact that while what plaintiff did might, in vacuo, be said to be obvious to one skilled in the art it was not, in fact, obvious to those who proposed to make their living through the harvesting of clams. A visual examination of plaintiff's 1952 rig did not lead to successful duplication. Instead, a direct examination and actual copying of dimensions were used to build a successful reproduction, a reproduction after which apparently all other Maryland Tidewater Chesapeake Bay rigs of that date were copied. What plaintiff did was useful and commercially successful and, if the law were not what it is, his device might be said to have been pirated by others. However, invention under the Patent Laws is a matter of black and white, having no gray area offering protection to those who, although conceiving and executing a device resulting in a practical contribution, do not thereby rise to the heights of invention. "[C]ommercial success without invention will not make patentability." (Atlantic & Pacific Tea Company v. Supermarket Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162).

Of utmost significance on the issue of validity is that admittedly plaintiff in 1950 had a device which in substance was the same as the one upon which he secured the patent in suit except for the element of a conveyor. The 1950 device was not succcessful, using as it did a net as a collector. It was not, apparently, patentable. In 1952 plaintiff added to his 1950 device a relatively standard type of conveyor, it being "conventional" and "as simple as could be". The question before this court, the answer to which is controlling, is whether or not the combination of two quite well known devices can be considered any more than an aggregation as opposed to a patentable combination. Again the court must turn to the principle laid down by the Supreme Court in the Atlantic & Pacific Tea Company case.

■ "It is agreed that the key to patentability of a *mechanical device* that brings old factors into cooperation is presence or lack of invention. In course of time the profession came to employ the term 'combination' to imply its presence and the term 'aggregation' to signify its absence, thus making antonyms in legal art of words which in ordinary speech are more nearly synonyms * * * 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' [Lincoln Engineering Company v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008] * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being

brought into concert, but this is not the usual result of uniting elements old *in mechanics*. * * * Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to· skilled artisans." (Atlantic & Pacific Tea Company v. Supermarket Corp., 1950, 340 U.S. 147, 150–152, 71 S. Ct. 127, 129, 95 L.Ed. 162; emphasis supplied).

Applying this rigid test the court can reach only the conclusion that the claims in suit of the Hanks patent are invalid for lack of invention. However, were these claims to be held valid they would not be infringed by the accused devices.

### Non-infringement of Hanks Patent

Claim No. 13 and claim No. 14 of the Hanks patent are limited to runners above the front edge or blade of the scoop, their stated purpose being the controlling of the depth of the cut. The runners disclosed by the Hanks patent are of such a width that the combined width of said runners at their forward ends is equal to two-thirds of the distance between the side plates which support Hanks' blade. The support members used on the accused devices to support the agitating jets in advance of the blade are approximately one and one-half inches in width. The court finds that the credible evidence is to the effect that these support members, when the dredge is in operation, do not rest upon the stream bottom and are almost always above the stream bottom, the depth of the cut of the stream bed being controlled by the rope or chain and pulley which permits raising or lowering of the rig.

This conclusion is dictated by an analysis of the nature of the digging operation performed by the jet nozzles; by actual physical evidence on the one-half intact side section of a typical Chesapeake Bay worn hydraulic rig head; by the testimony of the plaintiff that in many instances the device is not, and is not intended to be, when properly operated, supported by the angle irons; and by plaintiff's own departure from his patent disclosures relative to the use of runners.

The typical rig has side plates measuring eighteen inches at the top and fourteen inches at the bottom. Connected to the side plates transversely at the bottom of said plates is the blade which measures six inches wide and between twenty-four to thirty-six inches across. The blade is welded to the side plates at about a two and one-half inch tilt. The manifold, fed by a four inch hose with ten jet nozzles of one-half inch pipe directed at a forty-five degree angle so as to project a hydraulic stream about three inches ahead of the blade, is joined by two parallel one and one-half inch angle irons. The side plates which support the blade and the manifold for the jets are in turn supported by a block and tackle adjusted from the deck of the boat. From the standpoint of infringement the location of the outside jets immediately adjacent to the sides of the head of the dredge is a critical matter. The jet nozzles made of half inch pipe are about three and one-half inches apart from the center of each nozzle to the center of the nozzle adjacent to it. As they project their fluid jets down into the bottom of the trench which they are digging in the bed of the stream, the projected jets either have to overlap at the bottom or be in contact with each other to dig the trench. The two outside jets next to the two parallel angle irons make the sidewall of the trench. As the outside jets are approximately one-fourth an inch adjacent the angle irons which support the manifold, these jets cut a trench both inside and outside of the side plates. Since each jet nozzle has an effective digging width at the bottom of about three and one-half inches, the width of the trench must be the width from one outside nozzle to the other outside nozzle plus about an inch and a half

on each side at the bottom. Thus, there is an undercut dug in the trench at the bottom so that as the dredge moves forward in the trench the sidewalls of the trench tend to cave in, precluding the one and one-half inch angle irons from functioning as runners. Unless the angle iron is four inches wide or substantially more than an inch and a quarter or an inch and a half, it must follow logically that an inch and a half angle iron cannot function as a runner because it is inside the trench which is dug in the shape of a truncated pyramid. Another significant factor is that the head of the rig weighs from one-hundred to one-hundred and twenty-five pounds and that hingedly connected thereto is the conveyor which weighs some six hundred to seven hundred pounds. Thus, the angle irons, if acting as runners, must support in addition to the weight of one-hundred to one-hundred and twenty-five pounds at least a portion of the weight of the hingedly connected conveyor. Certainly this would be enough weight to cause the uppermost part of the undercut trench to give way so that the scoop is not really running on runners nor is the depth of the scoop in fact determined by the runners.

Turning to the typical Chesapeake Bay rig head introduced into evidence by the defendant and admitted by plaintiff to be representative of the accused rigs, the court noted that the front edge of the side plate at the very bottom of the blade was worn almost to a knife edge, but at the top it was about two or three times thicker than at the bottom, indicating a relative wear of three or two to one. Of significance is the fact that in the accused devices on the underside of the angle irons are U-bolt ends which support the manifold. This structure is not present in the Hanks patent but is merely a crudely devised method for fastening the manifold to the regular structural angle irons. A block of wood is used between the manifold and the angle irons in order to give a binding of metal to wood instead of metal to metal which might work loose. Beneath the U-bolt,

which is merely a rod bent in the shape of an inverted U, there are two nuts. The court measured the extent of protrusion of the thread of the bolts beyond the bottom of the one and one-half inch angle iron, noted that it was nine-sixteenths of an inch and that the threads were entirely intact under the nuts indicating no wear on the bottom of the angle irons.

Plaintiff admitted that the defendants' exhibit was authentic and had undoubtedly been used in dredging operations. These physical evidences of wear and lack of wear indicate to the court that the angle irons do not in fact operate as runners.

The plaintiff himself admitted frankly that there were a number of occasions during which the runners would not be engaged with the stream bottom, would not regulate the depth of bite, and where the dredge head would be supported by the rope and tackle on the accused device. This would be true in connection with running through shallow beds. In such a case the angle irons do not engage the bottom of the stream as it is inefficient to permit them so to do. In good weather the angle irons frequently do not come in contact with the bed of the stream. It is fair to say that plaintiff's testimony was that the angle irons would function as runners only during dredging when the wind was high and the clam digger was operating with a thirty-to-forty foot boat on the Chesapeake Bay with the boat tossing up and down three to four feet. His exact testimony was as follows:

"When you have calm weather, you can operate a clam rig with the dredge being supported by the lifting device, the block and tackle or the electric hoist or the hydraulic hoist, whatever you have to lift this conveyance, you can pull it off the bottom part way and support it by this overhead device, and it will go along then and catch the clams fine, especially if you are working on small clams, such as a clam this size (producing clam), which is small,

and it will not be in 18 inches. It will probably be in 12 or 15 inches, and, therefore, they will pull up the device that they will not have to dig so much bottom and let it travel through the bottom easily and quickly.

"However, when the wind blows and you are in a 30 to 35 or 40 foot boat and you are working on the Chesapeake Bay, and the boat is jumping up 3 and 4 feet, and you are holding the apparatus from a stanchion on the side of the boat or a device rigidly controlling the depth; as the boat goes up, so does the device. As it comes down, it will go down in the hole; it will come up and go down. So, therefore, they can't operate a clam rig from a support from the boat at all times.

"They must slacken the thing off, the device off, and let it go on down and let it run along the bottom, especially when it blows hard. Then the runners get the abrasive action and they do all wear a little bit. Often, the device, the angle iron, it is up in an angle, rather than running along the level; therefore the front end of it, where the U bolts are aren't even touching. The back end will be touching the bottom. The back end about where the cross member is—right along here will be touching from here along in here. Of course back here, it won't touch at all, because that is already dug away; there is already a slot or a cut made by the side." (Transcript, pages 311–312).

The typical Hanks' clam rig in use over the last four or five years is different from and does not follow the teachings of the plaintiff's patent in that the runner width was made narrower until it ceased to be a runner. Plaintiff testified relative to his 1952 rig which did follow the teaching of his patent that "it had wide runners on it, because it was like all the first ones, everybody had wide runners until we found out that the sand

settled on the runners, and we carried a lot of weight on the runners. Therefore, we cut down the width of the runner gradually until we reduced the runners to an inch and a quarter or an inch and a half so that the sand would not build up on it, because it is there in still water. It is so still that the sand will be up in a peak on the runners." (Testimony of Hanks, transcript, pages 358–359). The plaintiff's witness, Gernert, testified "of course, to this day, the rig that we had on that day then, and the rig we have today is far different from all of them, but originally they are from Mr. Hanks' patent." When questioned specifically as to the difference between the Hanks rig and the accused devices of today and the rig that was copied from Hanks in 1952, the witness replied "there is some *difference in principle* and all together the material was different except for the scoop and jet bar, which is still all iron, back where Mr. Hanks' rig was the scoop had runners on to it, boards on the side to keep it riding on the sand, and *today we find that we don't no longer need those boards on the side; more or less carry cable,* but approximately it is not too much of a change made from the wood to the iron." (Testimony of Gernert, transcript, pages 91–92; emphasis supplied). This testimony only reinforces the court's conclusion that the accused devices as well as the present day Hanks' rig do not have support members which when the dredge is in operation rest upon the stream bottom and function as runners whose purpose is to control the depth of the cut of the stream bed.

A departure from the teachings of the Hanks patent was also made in regard to the blade. In the patent, the blade was parallel to the runners, whereas the blade of the present day typical Hanks rig pivots with the conveyor so that in deeper water the angle of the blade is different. This construction was not taught by the Hanks patent and was not used in the early Hanks rigs. Defendants today do not use this feature of the present Hanks rig, as their blade is welded in place.

The necessity for and the function of the one and one-quarter inch angle irons used by defendants was characterized correctly, in this court's opinion, by plaintiff when he testified that the angle iron is a typical framing member, that as a manufacturer of clam digging rigs he used it as a typical framing member and that on other places on his rig he used a 2 x 2 angle iron for framing.[12] The angle iron is an ordinary expedient used so that one face can be attached to a vertical wall and another face can be used for supporting a shell. Accordingly, the court holds that claims Nos. 13 and 14 of the Hanks patent in suit, if valid, are not infringed by the defendants.

### Allowance of Attorneys' Fees.

■ The defendants' brief after trial relies upon Title 35, U.S.C.A. § 285 which provides that "the court in exceptional cases may award reasonable attorney's fees to the prevailing parties." They assert that this case is exceptional in that plaintiff has asserted or misused the Heden patent to harass and threaten the defendants with a patent that had an early expiration date; that an unfounded assertion of the Hanks patent was made despite full knowledge of the unpatentable 1950 rig in combination with the "simple" and "standard" conveyor of the 1942 Heden patent found by plaintiff's counsel during the patent search in 1950 and that plaintiff improperly used his patents to gain a substantial monopoly over "unpatented clams" [sic]. The court finds no merit in defendants' position. Suit was brought by plaintiff, in the opinion of this court, in good faith in an effort to protect what he honestly felt was his right in an improvement in the art rising to the stature of invention. On the questions of validity and infringement the court has found against the plaintiff, but it will not exercise its discretionary powers to award to defendants recovery of attorneys' fees or costs including the reporter's charges and the cost of the United States Patent Office file wrappers and the charts.

■ The court finds no merit in defendants' allegation that plaintiff has violated the anti-trust laws. In the early part of his operations he offered licenses for the use of his rig to different parties at rates differing from one another. The reason for the differentiation in the rate charge was in the main due to an earlier infringement suit brought by the plaintiff against members of the Queen Anne's Clam Diggers Association. This Association financed the suit which resulted in a settlement, at some expense. To compensate such association members for their proportionate share of the expenses plaintiff offered them licenses at lesser rates than offered to others. Of prime importance is the fact that in the last several years all license agreements offered by the plaintiff have been on the basis of a uniform rate.

During the early part of the trial, defendants' counsel moved for a declaratory judgment of non-infringement as to those claims in the Heden and Hanks patents which had been asserted by the plaintiff prior to trial but which were dropped at the beginning of trial. Plaintiff's counsel stated to the court that inasmuch as claims 12 and 13 of the Heden patent and claim 4 of Hanks patent had been withdrawn from this suit, plaintiff had no objection to the granting of the motion. Ruling on the motion was reserved by the court. Regardless of the apparent agreement of counsel as to the propriety of granting the motion, the court is not disposed to render a declaratory judgment of non-infringement as to claims which were not asserted by plaintiff and about which the court heard no testimony and as to which no evidence was offered by either side.

Accordingly, defendants' motion for a declaratory judgment of invalidity and non-infringement as to claims 12 and 13 of the Heden patent and claim 4 of the Hanks patent is denied without prejudice. The court holds that claims 1, 6, 7 and 8 of Heden are invalid and not infringed and that claims 13 and 14 of

12. Testimony of Hanks, transcript, page 365.

the Hanks patent are invalid and not infringed.

The foregoing opinion embodies the court's findings of fact and conclusions of law under Rule 52(a) of Title 28 U.S. C.A. Federal Rules of Civil Procedure but either side may submit requests for other or more detailed findings.

An appropriate decree in the two consolidated cases will be entered upon submission disposing of all pending complaints and counterclaims.