The **DUPLAN CORPORATION**,
Plaintiff,

v.

**DEERING MILLIKEN, INC.**, et al.,
Defendants.

**DEERING MILLIKEN RESEARCH
CORPORATION**, Plaintiff,

v.

The **DUPLAN CORPORATION** and Burlington Industries, Inc., Defendants.

The **DUPLAN CORPORATION** et al.,
Plaintiffs on the Counterclaim,

v.

**DEERING MILLIKEN RESEARCH CORPORATION**, Defendant on the
Counterclaim,

and

Deering Milliken, Inc., et al., Additional Defendants on the Counterclaim.

Civ. A. Nos. 71–306, 70–968, 69–1096, 68–705, 69–777, 70–14, 70–189, 70–250, 70–295, 70–358, 70–385, 70–386, 70–391, 70–493, 70–622, 70–628, 70–677, 70–683, 71–87 to 71–102, 71–115, 71–126, 71–127 and 71–283.

United States District Court,
D. South Carolina,
Spartanburg Division.

Feb. 21, 1974.

See also, D. C., 370 F.Supp. 790.

Leatherwood, Walker, Todd & Mann, Fletcher C. Mann, Greenville, S. C., Parrott, Bell, Seltzer, Park & Gibson, Charles B. Park, III, Charlotte, N. C., Willkie, Farr & Gallagher, David L. Foster, New York City, for The Duplan Corp., The Schwarzenbach-Huber Co.,

Jonathan Logan, Inc., Frank Ix & Sons Virginia Corp., Lawrence Texturing Corp., and United Merchants & Manufacturers, Inc.

Haynsworth, Perry, Bryant, Marion & Johnstone, O. G. Calhoun, Greenville, S. C., Cushman, Darby & Cushman, William K. West, Jr., Washington, D. C., for Burlington Industries, Inc., Madison Throwing Co., Leon Ferenbach, Inc., and National Spinning Co., Inc.

Perrin, Perrin & Mann, Edward P. Perrin, Spartanburg, S. C., David Rabin, Smith, Moore, Smith, Schell & Hunter, McNeill Smith, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Spring-Tex, Inc., Hemmerich Industries, Inc., Texelastic Corp., Dixie Yarns, Inc., and Olympia Mills, Inc.

Butler, Means, Evins & Browne, Thomas A. Evins, Spartanburg, S. C., Burns, McDonald, Bradford, Erwin & Few, Howard L. Burns, Greenwood, S. C., Paul, Weiss, Rifkind, Wharton & Garrison, Jay Greenfield, New York City, Morgan, Finnegan, Durham & Pine, Granville M. Pine, New York City, for Deering Milliken Research Corp., Deering Milliken, Inc., Moulinage et Retorderie de Chavanoz.

Ward, Howell & Barnes, Rufus M. Ward, Spartanburg, S. C., Brumbaugh, Graves, Donohue & Raymond, Granville M. Brumbaugh, Sr., New York City, for Ateliers Roannais de Constructions Textiles.

Robinson, McFadden & Moore, T. T. Moore, Columbia, S. C., Cooke & Cooke, Arthur O. Cooke, Greensboro, N. C., for ARCT, Inc.

## ORDER ON MOTION FOR FURTHER CONSIDERATION OF SUMMARY JUDGMENT MOTION

HEMPHILL, District Judge.

Burlington Industries, Inc. (hereinafter called Burlington) asks further consideration of its motion for summary judgment that U. S. Patent No. 3,117,361 is not infringed by the use of "false twist" (hereinafter designated FT) machines, manufactured by Ateliers Roannais de Constructions Textiles (hereinafter called ARCT–France) and sold by ARCT, Inc., Greensboro, North Carolina, a U. S. subsidiary of ARCT–France.

## THE CHARGE OF INFRINGEMENT

The patent under scrutiny, attached as Appendix A of this order, guarantees a patent monopoly on a heat treating machine (hereinafter called the heater), as applied to synthetic (non-man-made) fibers, having two distinct segments or zones in successive portions of a heater tube, each segment being separately heated (1) by a heating coil, and (2) by the passage of current through a portion of the tube, respectively. The patented invention is called a "bilobal" heater because the cross-section configuration of the heater has two lobes. In other words, the cross-section looks like a barbell lifting weight.

Identical construction is not present in the accused heaters in which the whole length of the tube is heated by passage of current through it, and essentially the whole length of the tube is heated also by the coil.

The owners of this patent allege direct infringement [1] under the doctrine of equivalents of claim 1 of the patent by Burlington and others (hereinafter designated as the Throwsters) by use of FT–400, FT–411, and those FT–3 and FTF machines (hereinafter designated as the accused devices) having a heater tube heated by the passage of current through the tube, and by an electrical coil wherein the two heating means are independently regulatable.

1. [W]hoever without authority makes, *uses*, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent. (Emphasis added to indicate type of direct infringement involved in this motion). 35 U.S.C. § 271(a) (1952).

The claim which the patent owner [2] alleges to be infringed is as follows:[3]

1. Yarn heat treating apparatus comprising an electrical resistance tube; *a first terminal* for electrical energy being *connected to said tube at a location intermediate the entrance and exit ends of said tube; another terminal* for electrical energy being *connected to said tube at a location at the exit end of said tube, the portion of the tube defined by said terminals defining a compensating heating zone* wherein yarn passed through the tube is treated at a temperature level approximating the desired temperature level for yarn treatment; a low thermal inertia electrical resistance *heating coil surrounding the tube between the inlet end of the tube and said first terminal* located intermediate the inlet and outlet ends of the tube, *said heating coil having a heating input capable of effecting a temperature very substantially higher than the desired temperature level* for yarn treatment *in the compensating zone* in order that rapid temperature changes may be effected, but controlled to a level below said desired temperature level for yarn treatment; said heating coil and the compensating heating zone being independently and individually temperature regulated.

## WHEN SUMMARY JUDGMENT IS PROPER

Summary judgment of direct infringement or non-infringement may be appropriate under certain circumstances. As stated in this court's earlier order of November 14, 1973, and restated here for the purpose of emphasis, it appears to this court that a motion for summary judgment of direct infringement or non-infringement may be granted in a patent case in any one of the four following situations provided there is no genuine issue of fact to be resolved:

First, where there is a file wrapper estoppel as to the patent owner's interpretation of the meaning of terms of art used in the claims, thus removing the accused device as a literal direct infringement;

Second, where no file wrapper estoppel exists and where there is no contest as to the meaning of terms of art but the accused device reads literally on the patent claims;

Third, where the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused device; and

Fourth, if there is no such file wrapper estoppel, where the doctrine of equivalents can be applied by the court without the aid of extrinsic evidence.

To avoid repetition of the analysis of the legal authorities leading to this synopsis, reference to the court's order of November 14, 1973, 370 F.Supp. 769, is respectfully invited.

## THE PRIOR MOTION

Since plaintiff admits that there is no direct infringement by the accused devices by a literal reading on the patent claims, neither the first nor the second situation applies.

The Throwsters' prior motion for summary judgment proposed that either the third or fourth situation was presented because the file wrapper estopped plaintiff from asserting a charge of direct infringement under the doctrine of equivalents against the accused devices, or, if there was no file wrapper estoppel, the doctrine of equivalents could be applied by this court without the aid of extrinsic evidence.

In its order of November 20, 1973, 370 F.Supp. 790, on this prior motion, this

2. The patent in issue was assigned by the inventor to Moulinage et Retorderie de Chavanoz, a French corporation doing business in the United States.

3. The particular phrases in the claims which will be discussed later, are italicized.

court made 15 findings of fact as to the file wrapper and, in a one and one-half page analysis, determined that no "classic" file wrapper estoppel existed, as defined by the leading Supreme Court case. This court said, at 13:

> That doctrine [of "classic" file wrapper estoppel] applies in those instances where a patent applicant initially files broad claims and, after rejection of those claims by the Patent Office, narrows the claims by amendment to exclude part of the subject matter embraced within the original broad claims. The doctrine provides that if the narrowed claims are granted by the Patent Office, the patentee is estopped to charge direct infringement against devices that fall within the subject matter excluded by amendment. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–37, [62 S.Ct. 513,] 86 L.Ed. 736, 744 (1942); Power Curbers, Inc. v. E. D. Entyre Co., 298 F.2d 484, 494–95 (4th Cir. 1962).

> This doctrine is not applicable to the present case. . . . The requirement of the patent claims that the coil surround the inlet end of the tube was *not* something added by amendment, as the Throwsters assert, but was present in the application and claims as originally filed. (Emphasis in original).

This court then determined that it could not apply the doctrine of equivalents without the aid of extrinsic evidence. This court said, at 18:

Equivalence is a question of fact that can be best determined at trial in light of all of the surrounding circumstances, including the state of the prior art and the purpose and function of each element in the patented invention. . . . Because this inquiry cannot be meaningfully conducted without the aid of expert testimony and other extrinsic evidence, summary judgment on the issue of direct infringement should not be granted where equivalence is an issue.

## THE PRESENT MOTION

The Throwsters now move for further consideration of their motion for summary judgment. They contend that a different type of file wrapper estoppel[4] other than classic file wrapper estoppel exists. They also urge the court to compare the accused devices to the patented invention. It is said that the machines are simple enough that the doctrine of equivalents can be applied by this court without the aid of extrinsic evidence.

These grounds are the third and fourth of the four situations listed, supra, in which summary judgment in a patent infringement case is appropriate.

The Throwsters' call for the application of the third situation[5] warranting summary judgment, urging that the existence of a file wrapper estoppel by admission is different than the classic file wrapper estoppel argument considered by the court in its prior order of November 20, 1973. The question as to

---

4. During the course of oral argument on January 21, 1974, various counsel on both sides referred to this type of estoppel as either "something akin to file wrapper estoppel," or "estoppel by omission," or "estoppel by denial," or "estoppel by admission." Indeed, the sparse case law on this subject appears to use no uniform term. This court, for reasons stated infra, prefers the term "file wrapper estoppel by admission."

5. Initially, the Throwsters posited that file wrapper estoppel by admission presents a fifth situation in which summary judgment in a patent infringement case is appropriate. However, the situation presented here is ac-

tually another variation of the third situation presented and resolved earlier by this court in its order of November 20, 1973. The court is aware that there are several types of file wrapper estoppel. This knowledge led the court to define the third situation, to wit: "where the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused device", by using the general phrase "where the file wrapper estops," and not by using more limited phrases referring to only one or two types of file wrapper estoppel, such as classic file wrapper estoppel or file wrapper estoppel by admission.

whether or not a file wrapper estoppel exists is a question of law for the court.

The Throwsters' call for the application of the fourth situation warranting summary judgment on the theory that the doctrine of equivalents can be applied by a court without the aid of extrinsic evidence is the same as their earlier argument considered and rejected by this court in its previous order. The question as to whether or not the accused devices are equivalents of the patented invention is a question of fact for the jury. Where genuine issues of material fact exist, summary judgment cannot be granted.

Because of the disposition this court makes of the defense that a file wrapper estoppel by admission exists, it is unnecessary to reconsider that part of this court's prior decision of November 20, 1973 that the question of equivalence should be allowed to go to the jury.

### FILE WRAPPER ESTOPPEL BY ADMISSION

■ As a matter of law, this court finds that the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused devices because an admission made by the patent attorney (prosecuting the patent application for the invention before the examiner in the Patent Office) conclusively demonstrates that the scope of the invention was not intended to cover the accused devices. This admission appears in writing in the file wrapper containing the patent prosecution papers in the Patent Office.

In order to show how the admission by the patent attorney constitutes a file wrapper estoppel, it is necessary to go into considerable detail. The court has been presented the following items, about which there is no dispute: the patent itself (Exhibit No. 153); a prior art patent, Stoddard Patent No. 2,803,105,[6] "Apparatus for Processing Textile Yarns" (Exhibit No. 473); the file wrapper of the patent here in suit (Exhibit No. 950); and two physical exhibits, i. e., the accused devices (Exhibit Nos. 967 and 993).[7]

### STATEMENT OF APPLICABLE LAW

The most succinct definition of the general doctrine of file wrapper estoppel has been given in Berry Brothers Corp. v. Sigmon, 317 F.2d 700, 706 (4th Cir. 1963), as follows:

A patentee, having deliberately taken a position in the Patent Office proceedings to induce the grant of the patent to him, is not thereafter permitted to repudiate that position. This is what is meant by file wrapper estoppel.

■ There are various types of file wrapper estoppel. One form is known in patent circles as "classic" file wrapper estoppel because this doctrine was set forth forcefully by the United States Supreme Court. In Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 518, 86 L.Ed. 736, 744 (1942), involving a patent of a device, which is peculiarly adapted to use on pin ball games, Chief Justice Stone said:

By striking that phrase ["carried by the table"] from the claim and substituting for it "embedded in the table" the applicant restricted his claim to those combinations in which the conductor means, though carried on (sic) the table, is also embedded in it. By the amendment he recognized and em-

---

6. The fact that this patent has been found invalid in In re Yarn Processing Patent Validity Litigation, 360 F.Supp. 74 (S.D.Fla. 1973) reversed, 498 F.2d 271 (5 Cir. 1974) is inconsequential. An invalid patent continues as a prior art publication bar against the patentability of any subsequent similar invention. However, infringement, not patentability, is the issue here.

7. The exhibit numbers are those given by the Clerk of Court to those objects or papers presented during exhaustive discovery. Counsel for all parties have agreed that all exhibits admitted without objection may be considered by the court subject to objections as to relevance, redundancy, etc., at trial.

phasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference. . . . The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him. (Citations omitted.)

It followed that the patentee, by a strict construction of the allowed claim —conductor means carried by the table —could not regain the disclaimed matter—conductor means carried by the table but not embedded in it—by the doctrine of equivalents, which operated by liberal construction, to secure to the applicant the full benefits of the invention.

This court has a different form of file wrapper estoppel before it. It is not a novel form but has been handled by other courts. Extensive quotation from two cases involving similar facts are apropos.

In Welch v. General Motors Corp., 330 F.Supp. 80, 83–84, (E.D.Va.1970), affirmed per curiam, No. 14,468 (4th Cir. 1970), the court said:

> The defendant sets up the rule of file wrapper estoppel against the equivalency doctrine. . . . While the Court is not convinced that that estoppel doctrine, properly so called, applies to this case, nevertheless, in a broad sense, it has some force. For the court can infer from the specifications in the application and representations as to the purpose of various elements made to the patent examiner that the doctrine of equivalents cannot place the accused device within the terms of the Welch patent.
>
> \*　\*　\*　\*　\*　\*
>
> The plaintiffs included in each claim presented in their patent application the element of shims. Therefore they are not now in the position of having cancelled a claim which in terms embraced the defendant's shimless device. [Classic file wrapper estoppel]. Yet the file history is in a

way even more damaging to their contentions than if such had been the case, for several times prior art was distinguished, in representations to the examiner, on the specific ground that shims were lacking. . . . When prior art is distinguished in argument before the examiner on the ground of its lack of certain characteristics, although the applicant does not simultaneously narrow his claims, this Court concludes that the construction of claims thereafter accepted must be limited by the applicant's representations. [File wrapper estoppel by admission]. Such a rule is strongly suggested by dicta in the *Marvel* case, *supra*, 330 F.2d 177 [(4th Cir. 1964)]. The defendant's device is distinguishable from the plaintiffs' claim on the same grounds—it lacks shims and ease of disassembly—which the plaintiff urged against prior art cited by the Patent Office. The plaintiffs cannot now claim that a function performed by its device which they stressed in contrasting it with prior art is not a vital part of their claim, such that an accused device lacking such function might still be "equivalent" in law.

Another case involving what this court calls file wrapper estoppel by admission is Marston v. J. C. Penney Co., 324 F.Supp. 889 (E.D.Va.1971), affirmed per curiam, 469 F.2d 694 (4th Cir. 1972). The court said, at 894:

> Even if the pad of Penney's products is a possible equivalent to the plaintiff's structure, the position taken by Marston in defending his patent estops him from asserting that an article embodying his claims save for the individually sealed cells infringes. No [classic] file wrapper estoppel, depending upon actions taken in patent office proceedings, arises, for no claim incorporating unsealed units was presented and rejected. [Citations omitted]. Nonetheless, as in Welch v. General Motors Corp., *supra*, something very close to file wrapper estop-

pel springs from the position Marston took in distinguishing prior art.

Remarks accompanying Marston's second submission of four claims to the patent office distinguished his claim from those of French patent No. 379,662 (DuPont) on the ground that the latter did not include a "link section arrangement," no "radial arrangement of rows of sealed portions." It is true that this statement apparently refers to claims 3 and 4, as allowed. However, as a gloss upon the claims' element of individually sealed link sections, which appears in all four claims, it can only sensibly be read to limit those claims in the same manner. . . . This is in accord with the public interest in preventing an outstanding patent from deterring further invention; in order to serve that interest, disclaimers of record once made cannot be withdrawn. [File wrapper estoppel by admission].

During the course of oral argument, one of the non-patent attorneys in this case made a simplistic analogy involving classic file wrapper estoppel and file wrapper estoppel by admission. The court borrows and paraphrases.

Consider the wall of a room from the floor to the ceiling with a "no smoking" sign half way up the wall. A patent applicant comes in and claims from the floor to the ceiling. The Patent Office cites prior art covering the ceiling and rejects the claims therefor. The applicant amends the claims to cover from the floor only up to the "no smoking" sign. The claims are then allowed by the Patent Office. The patent owner cannot thereafter assert the doctrine of equivalents against any device that is akin to the ceiling. This is the doctrine of classic file wrapper estoppel.

Consider a different wall. Another applicant comes in and claims from the floor up to the "no smoking" sign. The Patent Office cites prior art covering the ceiling and rejects the claims. The applicant admits that the claims do not cover the ceiling, makes the claims more

definite, and resubmits them, again claiming from the floor only up to the "no smoking" sign. The claims are then allowed by the Patent Office. The patent owner cannot thereafter assert the doctrine of equivalents against any device that is akin to the ceiling. This is what this court defines as file wrapper estoppel by admission.

In the prior order of November 20, 1973, this court determined that the first example was not present in this case. The second example was not dealt with. It is considered here and this court finds that it is present.

## ANALYSIS

The original specification which was filed with the application is identical to the published specification in the patent. Looking at the patent specification to determine the scope of the invention, the court finds the applicant begins with a discussion of the prior art and the difficulties he has encountered. See attached Appendix A, page 405, column 1. He then relates what is the exact invention. The patent says (col. 1, ln. 67 through col. 2, ln. 14):

The invention consists in an arrangement employing a preheating system which, while requiring no precision and being regulated independently of the final heating system, for example by a thermostat, brings the temperature of the filament roughly to a level slightly below the very precise, constant temperature required for the treatment proper.

Since the precision of the temperature of the preheating system is not high, it is then easy to employ an adjusting system acting on an "all-or-nothing" or "all-or-little" basis, the voltage of the preheating system being very much higher than the equilibrium voltage, so that a rapid supply of calories is possible should it be necessitated by the speed and the count of the filament.

The two systems, i. e., the preheating system and the compensating sys-

tem, are mounted one behind the other in the direction of travel of the filament, in such manner that the filament cannot be substantially cooled between the two.

Thereafter, the inventor states specific ways of carrying out the invention described above. The patent drawing (see Appendix A, page 404, fig. 1) clearly illustrates one specific embodiment of this invention which has two heating zones. One is a pre-heating zone; the other, a compensating heating zone. They are disposed with respect to each other so that the yarn, Y, first travels through one zone, and then subsequently through the other zone.

The court uses the term "subsequently" and so does the patent specification (Appendix A, page 405, col. 2, ln., 19–34):

> The zone within the tube and the resistance coil at the input end of the tube serves as a preheating zone, while the *subsequent* zone within the after section of the tube serves as the compensating zone for bringing the yarn temperature to the desired value, within substantially small limits. The resistance coil receives its electrical energy in regulated quantity from a suitable source of E.M.F. . . . . .
> The electrical energy supplied to the subsequent compensating zone of the tube is separately similarly regulated. . . . (Emphasis added).

What the patent teaches is the invention of a heater tube having two zones which are mounted one behind (subsequent to) the other. The heating coil defines one zone, the lower preheat zone portion A; the remainder of the heater tube defines a second zone, the compensating zone B. (See Appendix A, page 404, fig. 2).

The patent also describes clearly the function of these two zones. The purpose of the first zone is to put into the yarn a large input of heat so as to bring the temperature of the yarn up near, but

not up to, the final desired temperature. The heating coil supplies this unit of heat. The patent gives an example (see Appendix A, page 404, fig. 2); if a user wants a final temperature of 220° C., then initially, the temperature of the yarn is brought up to some lesser temperatures, such as 210° C., in the lower preheat zone portion A; thereafter, in the compensating zone B, the user increases the temperature to a slightly higher degree by a very precise control, so that the yarn assumes the desired higher final temperature of 220° C.

The inventor claims this type of regulation is superior to any device that was ever invented beforehand and the patent specification emphasizes that there are two different temperature levels which are to be achieved in these two different zones.

After looking at the specification as originally filed, the court reviews the processing of the patent application as it progressed through the U. S. Patent Office. All of the initial claims were rejected by the Examiner and were ultimately cancelled. This first official office action appears in the file wrapper. (*Exhibit No. 950*)[8] *at pages 18–19.* The Examiner says "No claim is allowed" in his summary. Id., at 19. If one looks back at the original claims which were submitted and numbered 1 through 14, a line is drawn completely through them from the bottom of the left hand side through ，to the top of the right hand side of each page. Id., at 8–10. This is the way in which the Patent Office shows that those claims were cancelled out. The patent attorney's instructions to cancel those claims appears later. A paper filed December 20, 1961 by the applicant, over the signature of his patent attorney, states: "Cancel claims 1–14, inclusive. . . ." Id., at 21.

It is instructive to examine the cancelled claims to see what the applicant was initially trying to patent as his in-

8. See note 7, supra.

vention. Cancelled claim 1 is an independent machine[9] claim which states:

> 1. Yarn heat treating apparatus comprising yarn heating means for preheating a running length of yarn to a first temperature level, and compensating heating means closely adjacent said preheating means for bringing said yarn temperature to a second desired temperature level, said second temperature level being the desired yarn treatment temperature. Id., at 8.

This statement in cancelled claim 1 is precisely in accord with the explanation in the specification of figure 1 in the patent drawing, i. e., the whole purpose of having two zones was to have a different temperature level in each zone. Claims 2 through 10 are claims dependent[10] on claim 1. They are simply variations on the concept of two different temperature levels but all contain the same limitations as claim 1. Cancelled claim 11 is an independent process[11] claim which states:

> 11. The method of thermally treating thermoplastic yarn comprising preheating a thermoplastic yarn to a first temperature level above ambient room temperature and below the desired yarn treating temperature, and then supplying further energy to said yarn to raise it to a second desired temperature level at which it is desired to treat said yarn. Id., at 9.

Again, the applicant is discussing a first temperature level and a second tempera-

ture level. This claim, along with its dependent claims 12–14 were also cancelled out.

Later, the applicant returned to the Patent Office with new claims which were numbered 15–22 (Exhibit No. 950, at 21–24.) The applicant was again talking in terms of different temperature levels in some of these claims but to understand what went on in the Patent Office, one has to look very carefully at claims 15–22.[12]

The reader should now make reference to Appendix B. At the bottom of Appendix B is a recitation of claim 17 which was not allowed by the Examiner. At the top of Appendix B is a recitation of claim 21 which was allowed. The significance of the two figures in the middle will be explained shortly.

Rejected claim 15, ultimately cancelled, states:

> 15. Yarn heat treating apparatus comprising an electrical resistance tube: yarn preheating means for preheating a running length of yarn to a first temperature level within said tube, and compensating heating means *closely adjacent* said preheating means for bringing said yarn temperature to a second desired temperature level within said tube, said second temperature level being the desired yarn treatment temperature; said preheating means having a heating input capable of effecting a temperature very substantially higher than said first temperature level in order to effect a

---

9. A machine or apparatus claim is one of several types of claims that may be allowed. 35 U.S.C. § 101 (1952) provides:
   Whoever invents or discovers any new and useful process, *machine*, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor. . . . (Emphasis added).

10. A dependent claim is defined by 35 U.S.C. § 112 (second paragraph) (1965) as follows:
   A claim may be written in independent or dependent form, and if in dependent form, it shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim.

11. A process or method claim is another type of claim that may be allowed. See 35 U.S.C. § 101, supra, note 9.

12. It is most important to look at what the Examiner does because patent examiners are taught from the beginning to pay attention primarily to what they call "structure," i. e., the "nuts and bolts" of the claimed invention. Broad generalizations, defining "function" alone, which cannot be tied down to a specific machine, process, etc., do not mean anything to examiners. Writing patent claims is like trying to define the shape of a cloud. If one can precisely define the shape of a cloud by detailing where all particular pieces go together, the Examiner will give a person a patent on it.

rapid temperature change and comprising a low thermal inertia heating coil surrounding the tube from the entrance end of said tube to a location intermediate the entrance and exit ends thereof; the compensating heating means being defined by input and outlet electrical terminals connected to said tube, one of said terminals being located *closely adjacent* to the heating coil, the other being located at a linearly spaced location toward the exit end of said tube. (Emphasis added). Id., at 21–22.

Claim 16 is dependent on independent claim 15. Independent claim 17 is recited in attached Appendix B hereof and it is therefore unnecessary to repeat it here. Claim 18 is dependent on independent claim 17. Independent claim 19 states:

19. Yarn heat treating apparatus comprising an electrical resistance tube, said tube being divided into a compensating zone located at the exit end of said tube and a preheating zone which embodies the remaining portion of said tube at the entrance end thereof; the preheating zone being defined by a low thermal inertia heating coil for preheating running lengths of yarn to a first temperature level; the compensating heating zone being defined by compensating heating means for bringing said yarn temperature to a second desired temperature level, said second temperature level being the desired yarn treatment temperature; said compensating heating zone being defined by electrical leads connected to said tube, the first of said leads being connected to the tube at a location *immediately adjacent* to said heating coil; said heating coil and compensating heating means being individually temperature regulated, the heating coil having a heating input capable of effecting temperatures very substantially higher than said first temperature level in order

to effect a rapid temperature change. (Emphasis added). Id., at 23.

Claim 20 is dependent on independent claim 19. Claims 15–20 were rejected by the Examiner. Claim 21, recited in Appendix B, was allowed and issued as numbered claim 1. It also appears at pages 3–4, supra, of this order. Claim 22 is dependent on independent claim 21 and was allowed as claim 2 in the issued patent. It is not relevant here.

The important distinction in the structure described in independent claims 15, 17, 19, and 21 is the *location* of the heating coil *in relation* to the compensating zone. This is the distinction which the Patent Office made. It is illustrated clearly by rejected claims 15, 17, and 19 on the one hand, and allowed claim 21 on the other hand.

Notice in rejected claim 15 that the only limitation as to the location of the first terminal is that it is "closely adjacent" to the heating coil. Notice, also, that in rejected claims 17 and 19 the only limitation as to the location of the first terminal is that it is "immediately adjacent" to the heating coil. "Closely adjacent" and "immediately adjacent" do not say adjacent *where*. Thus, as rejected claims 15, 17, and 19 read, the first terminal may be closely or immediately adjacent to the heating coil at the entrance, at the exit, or at any intermediate point along the tube. The Examiner consistently rejected those claims that could be interpreted to mean that the heating coil was *inside* the zone defined by the first and second terminals.

Referring now to the two figures in attached Appendix B, one sees in the lower figure that the Examiner rejected claim 17 in which the first terminal could be at the entrance so that the heating coil could be between the first and second terminals by the language: "the first of said leads being connected to the tube at a location immediately adjacent to the heater coil. . . ." In the upper figure, one sees that the Ex-

aminer allowed only claim 21 which said that the heating coil was *outside and preceding* the zone defined by the first and second terminals by the language "a low thermal inertia electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube. . . ."

To reiterate for the sake of emphasis and clarity, the terms "closely adjacent" and "immediately adjacent" do not pinpoint adjacent *where.* If claims 15–20 were allowed, the first terminal could be closely or immediately adjacent on either side of the heating coil. If the first terminal is adjacent on the entrance side of the coil, as claim 17 could be read, the patent would cover the heater drawn as the lower figure in Appendix B. In other words, claims 15–20 that the Examiner rejected covered a heater where the terminals were at the entrance or at the exit ends and the heating coil was between the two terminals. The Examiner allowed only claim 21 which limited the heating coil to a location between the entrance end and the first terminal.

The reader should now refer to attached Appendix C. The uppermost figure is a portrayal of the accused heater. Notice that the accused heater has terminals at the entrance and the exit and that the heating coil is entirely between those terminals. Claim 17 which the Examiner rejected did not read exactly on the accused heater but it did read on the lower figure in Appendix B. The only colorable difference between the *uppermost* figure in Appendix C and the *lower* figure in Appendix B is that, in the latter, the heating coil surrounds only the entrance end of the heater, whereas, in the former, the heating coil goes all the way up the entire length of the accused heater. Therefore, what is presented here is a stronger case for file wrapper estoppel than the classic situation in which a device is claimed and rejected because here the applicant never reached the point of claiming the heater,

now accused to be an infringement, since the Examiner rejected claim 17 which almost covered the accused heater but did not.

Now, the question to ask is, "What reason is there to believe that the Examiner would have allowed a claim in which the heating coil, instead of covering only the entrance, went all the way up the entire length of the heater?" The answer is clearly "none!"—because the file wrapper shows that the Examiner was relying on the prior art, Stoddard Patent No. 2,803,105, in which the heating coil goes all the way up the entire length of the heater (see attached Appendix D. fig. 2, item 34 and fig. 4, item 34a), and this applicant, via his patent attorney, *admitted* that his invention does not contemplate a heater in which the heating coil surrounds its entire length. The file wrapper, Exhibit No. 950, at 28, states:

> However, even if these references [Wedler and Van Dijk] be combined, though unwarrantedly, the resulting apparatus would still not comprise a single tubular element capable of providing two heating zones, one zone being defined by a low thermal inertia heating coil surrounding the entrance end of the tube, the second zone being defined by electrical terminals connected to the tube in such a manner that one is located intermediate the entrance and exit ends of the tube and closely adjacent to the heating coil. This particular feature of applicant's invention is essential to provide the heating treatments desired by applicant.

Claims 6–10 were rejected as unpatentable over the Belgian patent or Wedler in view of Stoddard et al. who disclose the use of heating coils completely surrounding the *entire length* of a continuous tube. Neither of the primary references so much as remotely suggest the use of a continuous tube of any type. Consequently, the

combination of these references with Stoddard et al. is unwarranted in view of the respective disclosures thereof. Clearly, there is no suggestion in the Stoddard et al. patent, even if these references are combined, that the heating coil should surround only the entrance end of the tube, as is recited in the present claims, or that the remaining portion of the tube should be connected to a source of electrical energy, thereby providing a second heating zone. (Emphasis in original).

So, the applicant was trying to have the Examiner allow him a patent in which the terminals were at the entrance and exit ends and in which the coil went only part way up the length of the heater. The Examiner refused to do so by rejecting claim 17 because it, like claims 15 and 19, were not specific enough as to the location of the first terminal relative to the heating coil. The Examiner's Final Official Office Action, appearing in the file wrapper, Exhibit No. 950, at 30, states "Claims 15–20 are rejected as unpatentable over Van Dijk and Stoddard et al., both of the latter of record." The Examiner allowed only claims 21–22 where the applicant was very specific and put the heating coil outside, not between, the two terminals, from the entrance and to the first terminal. This is the true meaning of claim 21, now issued claim 1, of the limitation "heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube. . . ."

Therefore, this court finds, as a matter of law, that because of the distinguishing language in issued claim 1 and because of the admission made to the Patent Office, the patent owner is estopped from asserting that claim 1 has a contrary meaning and thus cannot assert a charge of direct infringement under the doctrine of equivalents against the accused devices herein.

As a necessary result of this conclusion of law the court does not reach the question as to whether or not the doctrine of equivalents can be applied by the court without the aid of extrinsic evidence, such as the deposition of the inventor and the affidavit of the claimed expert Fox.

PATENT OWNER'S POSITION

To counter the legal theory of file wrapper estoppel by admission, the patent owner contends since there was no reliance by the Patent Office, there can be no estoppel. It is pointed out that the Examiner did not rely on the patent attorney's admission, did not withdraw the Stoddard reference that the patent attorney was arguing to distinguish, but did apply that same reference again in rejecting claims 15–20. The authorities cited for this proposition are 28 Am. Jur.2d, Estoppel and Waiver, §§ 76–77 (1966); 31 C.J.S. Estoppel § 71, at 428–431 (1964); Smith v. Mid-Continent Investment Co., 106 F.2d 622 (8th Cir. 1939); Denominational Envelope Co. v. Duplex Envelope Co., 80 F.2d 186 (4th Cir. 1935).

The citations from the two encyclopedia of law relate to equitable estoppel in general, not file wrapper estoppel in patent cases, and are therefore not apropos.

In *Smith*, supra, 106 F.2d at 627, the court said:

Where broad claims are denied in the Patent Office and the applicant accepts the ruling of the Office and substitutes narrower claims upon which a patent issues, the patentee is estopped to extend construction of the granted claims to include the matter denied (citations omitted). Such an estoppel is not, however, based upon the discussion in the Office or even upon statements made, in the Office, by the applicant but rests upon the rejection. and substitution of claims. Keystone Driller Co. v. Northwest En-

gineering Corporation, 294 U.S. 42, 48, 55 S.Ct. 262, 79 L.Ed. 747. Appellant relies upon certain rejection of claims by the Office and also upon certain statements of the Examiner and of the applicant. Under the rule above stated, we consider only the rejection and substitution of claims as the possible basis of estoppel.

In *Keystone Driller Co.*, supra, 294 U.S. at 48, 55 S.Ct. at 265, 79 L.Ed., at 750–751, the Supreme Court said:

> We do not attribute the force of an estoppel to what was said by the claimant in seeking to avoid the prior art cited against his broad claims, but we do apply the principle that, where such broad claims are denied and a narrower substituted, the patentee is estopped to read the granted claim as the equivalent of those which were rejected. (Footnote omitted).

It is clear that these two cited cases deal with classic file wrapper, not the type of file wrapper estoppel involved here. If these cases can be considered as persuasive authority, it is interesting to note that, according to Shepard's Federal Citations, the citation from *Smith*, supra, interpreting the citation from *Keystone Drilling Co.*, supra, has *never* been cited by any court since the decision was handed down in 1939. This court suspects that the *Smith* interpretation is erroneous and was overruled *sub silentio* by the Supreme Court in Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 518–519, 86 L.Ed. 736, 744 (1942), decided three years later. There, the Supreme Court used also exactly opposite language in discussing classic file wrapper estoppel. The Court said:

> Whatever may be the appropriate scope and application of the doctrine of equivalents, where a claim is allowed without a restrictive amendment, it has long been settled that recourse may not be had to that doctrine to recapture claims which the patentee

has surrendered by amendment. Id., at 136, 62 S.Ct. at 518.

The difference which he [the applicant, via his patent attorney] thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him. Id., at 137, 62 S.Ct. at 519.

The last case relied upon by the patent owner is *Denominational Envelope Co.*, supra. In that case, the Fourth Circuit, per Judge Soper, said:

> By reason of this file history, the defendants contend, as we understand their argument, that the plaintiff is estopped to claim that its patent covers any device other than one which includes the specific construction of a rotary valve mounted on a shaft. . . . But the claim in suit does not limit the construction to a rotary valve, and the statement of the solicitor in the course of the Patent Office proceeding to this effect may not be carried into the claims allowed. It seems likely that he had reference to claims subsequently rejected, which contained this limitation. Whether or not this was his meaning, it is the language of the claim, and not the argument of patent counsel which controls. Of course the claim as allowed must be read and interpreted with reference to the rejected claims, and to the prior state of the art, and cannot be construed to cover what was rejected by the Patent Office or disclosed by prior devices. [Citation omitted.] On the other hand, the solicitors' arguments of themselves set up no estoppel. "We read the claims as they are written, like the language of any other formal statement drawn up as the final memorial of the parties' intentions, and we decline to consider what was said arguendo during the passage of the case through the Patent Office, or any other of the preliminary negotiations which the patent itself was intended to subsume."

[Citations omitted.] Id., 80 F.2d at 192–193.

This passage from *Denominational Envelope Co.*, supra, has been cited six times since it was first written in 1935 by various district courts, Bowser, Inc. v. Richmond Engineering Co., 166 F. Supp. 68, 76 (E.D.Va.1958), affirmed in part, reversed in part, 264 F.2d 595 (4th Cir. 1959); Car-Freshner Corp. v. Marlenn Products Co., 183 F.Supp. 20, 25 (D.Md.1960); Entron of Maryland, Inc. v. Jerrold Electronics Corp., 186 F.Supp. 483, 503 (D.Md.1960), affirmed in part, reversed in part, 295 F.2d 670 (4th Cir. 1961); Hanks v. Ross, 200 F.Supp. 605, 614–615 (D.Md.1961); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F.Supp. 1, 8 (D.Md. 1963), affirmed, 327 F.2d 497 (4th Cir. 1964), cert. denied, 379 U.S. 826, 85 S. Ct. 53, 13 L.Ed.2d 36; Blohm & Voss AG v. Prudential-Grace Lines; Inc., 346 F.Supp. 1116, 1144 (D.Md.1972); and cited only twice by circuit courts of appeals, S. H. Kress & Co. v. Aghnides, 246 F.2d 718, 723–724 (4th Cir. 1957), cert. denied, 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 189; Williams Bit & Tool Co. v. Christensen Diamond Products Co., 399 F.2d 628, 634 (5th Cir. 1968).

It appears to this court that, broadly speaking, the 1935 quotation from *Denominational Envelope Co.*, supra, advocates a "contract" theory of patent claim interpretation in which the court is precluded from examining any evidence of "prior writings" contained in the file wrapper by the language, "we decline to consider what was said arguendo during the passage of the case through the Patent Office, or any other of the preliminary negotiations which the patent itself was intended to subsume." Id., 80 F.2d at 193.

It is again interesting to note that six of the eight cases following the *Denominational Envelope Co.* case were decided before 1966. It appears to this court that the "contract" theory of patent claim interpretation was refuted by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545, 565 (1966), in which the Court said:

It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. [Citations omitted.] Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. [Citations omitted.]

If the ruling in *Williams Bit & Tool Co.*, supra, decided in 1968, can be construed to be inconsistent with the Supreme Court's decision in *Graham*, supra, the opinion of the Fifth Circuit must be considered not good law. This conclusion appears especially compelling because the Fifth Circuit's opinion states:

The defendant argues that the step-faced bit just described does not infringe because it has a substantially different construction and operates in a substantially different way as compared to the bit of the patent. The district court so concluded, although holding that the step-faced bit falls within the literal words of claim 5. In so holding it relied upon an argument made in the Patent Office by the attorney for the applicant in support of the finally amended claims. In so doing, the district court erred. For it is the language of the claim, as amended to meet the Patent Office's objections, and not the argument of the applicant's patent attorney in support of it, which is controlling as to the existence of an estoppel. Catalin Corporation of America v. Catalazuli Mfg. Co., 2 Cir. 1935, 79 F.2d 593, 594; Denominational Envelope Co. v. Du-

plex Envelope Co., 4 Cir. 1935, 80 F.2d 186, 192–193. The purpose of such an amendment of the specification and claims is to limit and define the scope of the invention in the light of the prior art cited by the Patent Office against it and when the amendatory language is accepted by the Patent Office and a patent is issued in the amended form the language of the specification and claims, as thus modified and approved by the Patent Office, defines the invention and constitutes the grant and the patentees are not estopped by the proceedings in the Patent Office from so contending.

This holding, effectively not recognizing the doctrine of file wrapper estoppel, is not supported by any case law other than the two 1935 cases, decided long before the Supreme Court's decision in *Graham,* supra. This court refuses to follow the holding of the Fifth Circuit.

Indeed, the Fourth Circuit appears to have overruled its earlier decision in the *Denominational Envelope Co.* case and now follows the rule laid down by the Supreme Court in the *Graham* case. Nine days after the decision in the *Graham* case was handed down, the Fourth Circuit affirmed per curiam a summary judgment entered in a patent infringement case. In Morpul, Inc. v. Glen-Raven Knitting Mill, Inc., 4 Cir., 357 F. 2d 732, 734 (1966), the court said:

Thus, the sole question presented to the District Court on the motion for summary judgment was whether the addition of the crotch piece in the defendant's garment departed from the patent's prescription of a "seam." This in turn depends on the scope given that word in the grant of letters patent. In interpreting the claim of the patent, resort may properly be had to the prior state of the art, the specifications and, when related claims have been rejected by the Patent Office, to the file wrapper history. (Footnotes omitted.)

This court adopts and follows this direction of the Fourth Circuit. This court's analysis of the effect of the 1966 Supreme Court's decision in the *Graham* case and the 1966 Fourth Circuit's decision in the *Morpul* case as to their effect on the 1935 Fourth Circuit's decision in the *Denominational Envelope* case is buttressed by the Fourth Circuit's per curiam affirmance of the *Welch* case decided in 1970 and the *Marston* case decided in 1971. The Fourth Circuit affirmed per curiam in No. 14,468 (1970), the district court's statement in *Welch,* supra, 330 F.Supp., at 84:

When prior art is distinguished in argument before the examiner on the ground of its lack of certain characteristics, although the applicant does not simultaneously narrow his claims, this Court concludes that the construction of claims thereafter accepted must be limited by the applicant's representations.

The Fourth Circuit also affirmed per curiam in 469 F.2d 694, the district court's statement in *Marston,* supra, 324 F.Supp., at 894:

Remarks accompanying Marston's second submission of four claims to the patent office distinguished his claim from those of French patent No. 379,662 (DuPont). . . . [I]t [the attorney's remarks] can only sensibly be read to limit those claims. . . . [D]isclaimers of record once made cannot be withdrawn.

Assuming arguendo that the Fourth Circuit's 1935 opinion in the *Denominational Envelope* case is still good law, it is distinguishable from the case at bar because, narrowly speaking, it may be said to be confined to those cases in which the patent attorney's remarks were not relevant to the type of estoppel being set up by the accused infringer. Indeed, this interpretation seems to have been made in *Blohm & Voss AG,* supra, 346 F.Supp., at 1144, the only district

court case citing *Denominational Envelope,* supra, after the Supreme Court's 1966 decision in the *Graham* case. Even some of the earlier cases citing *Denominational Envelope,* supra, appear to make this same distinction. For example, in *Bowser,* supra, 166 F.Supp., at 76, the court said:

> Mere arguments of a patent solicitor before the Patent Office do not constitute file wrapper estoppel especially where such arguments are based upon limitations not carried into the claims.

To this effect, the patent owner contends that no file wrapper estoppel by admission arises because "the solicitor's argument could not have been directed at claims 21–22, which became patent claims 1 and 2", Chavanoz' Reply Memorandum, at 3, and, "[e]ven if the solicitor's argument was intended and understood as referring to all of the claims presented" . . . the court would be "reading a limitation found only in rejected claims into the claims that issued." Id., at 4.

It is clear to this court from the file wrapper that the patent attorney's argument and admission were directed at claims 21–22, now patent claims 1 and 2. A reading of the file wrapper reveals that the patent attorney's distinction of the Stoddard reference (Exhibit No. 950, at 28) was made precisely with re-spect to the claims presently at issue. At the time the distinction was made, claims 1–14 had been cancelled from the application and newly submitted claims 15–22 were the only pending claims. See Exhibit No. 950, at 21–24. Claims 21–22, in exactly the same form as they had been when the distinction of the Stoddard patent was made, became patent claims 1–2.

## CONCLUSION

The patent attorney's admission that the invention was not intended to cover matter disclosed in the Stoddard patent is a limitation on the claims that issued so that the phrase "heating coil surrounding the tube between the inlet end of the tube and said first terminal" in claim 1 of the patent cannot embrace any device wherein the heating coil is between the first and second terminals. Thus, as a matter of law, the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused devices.

■ This conclusion is the answer to a question of law for the court. Since there is no genuine issue of fact remaining, the motion for summary judgment that U. S. Patent No. 3,117,361 is not infringed by use of ARCT FT machines is granted.

And it is so ordered.

See Appendix on next page.

APPENDIX A

PAGE 1

Jan. 14, 1964        H. CROUZET        3,117,361

YARN HEAT TREATMENT APPARATUS

Filed Feb. 11, 1960

*FIG.-1-*

*FIG.-2-*

*FIG.-3-*

*FIG.-4-*

INVENTOR.
HENRI CROUZET

BY

*ATTORNEY*

# United States Patent Office

3,117,361
Patented Jan. 14, 1964

■

■

3,117,361
### YARN HEAT TREATMENT APPARATUS
Henri Crouzet, Roanne, Loire, France, assignor to Moulinage & Retorderie de Chavanoz, Chavanoz, France, a limited-liability company of France
Filed Feb. 11, 1960, Ser. No. 8,046
2 Claims. (Cl. 28—62)

This invention relates to the thermal treatment of linearly moving yarns, and more particularly to an improved thermal treating apparatus and method.

The continuous thermal treatment of thermoplastic filaments necessitates the application of extremely precise and constant temperatures.

On the other hand, the energy consumption for the heating makes up a considerable proportion of the cost, and all the systems have therefore been designed to obtain low consumption by the utilization of an effective thermal insulation.

In such apparatus, since the dispersion of heat is low, any too sudden addition of calories, whether the elements concerned have high or low thermal inertia, results in a substantial temperature rise, because, by reason of the time of transmission, the temperature continues to rise for some time after the cessation of the emission of current controlled by a regulating device, and conversely it continues to fall after the re-starting for the same reasons, so that it is very difficult to keep within the desired margin.

In order to keep within the desired margin, the heating has been effected either by controlling the voltage and current and adjusting it in such manner as to produce a constant temperature by equilibrium between the addition of calories, which is proportional to $I^2R$, and the losses through the insulation and the treated filament, or by a voltage regulation on an all-or-little basis, of which the "all" and the "little" encompass with very close approximation the voltage corresponding to the desired equilibrium temperature.

Regardless of whether the heating is effected by contact or by means of an ambient medium, such devices operate well when the quantity of heat carried away by the filament is negligible by reason of the low count of the filament and the low speed employed.

However, the operation of these prior apparatus and methods is not entirely satisfactory when treating filaments of increasingly high counts and increasingly high speed, since the quantity of calories carried away by the filament is no longer negligible, and the temperature of the heating element consequently varies materially in accordance with the speed at which the filament is traveling and in accordance with its count.

Thus, for example, with an electric heating device controlled by voltage adjustment, if the temperature is 220° C. when no filament is traveling through, this temperature will fall to 210° C., for example, when a filament of considerable count is passed through. If the voltage is adjusted to give a temperature of 220° C. when the filament is traveling at normal speed, this temperature will rise to 230° C. when the filament ceases to travel through, and will be progressively restored to 220° C. only some time after the filament has recommenced its travel. In both cases, therefore, the filament will have been treated under incorrect conditions.

The present invention has for its object to obviate this disadvantage.

The invention consists in an arrangement employing a preheating system which, while requiring no precision and being regulated independently of the final heating system, for example by a thermostat, brings the temperature of the filament roughly to a level slightly below the very precise, constant temperature required for the treatment proper.

Since the precision of the temperature of the preheating system is not high, it is then easy to employ an adjusting system acting on an "all-or-nothing" or "all-or-lit.le" basis, the voltage of the preheating system being very much higher than the equilibrium voltage, so that a rapid supply of calories is possible should it be necessitated by the speed and the count of the filament.

The two systems, i.e., the preheating system and the compensating system, are mounted one behind the other in the direction of travel of the filament, in such manner that the filament cannot be substantially cooled between the two.

The invention may be carried out in various ways. One preferred means of application comprises an electrical resistance tube which is surrounded at the end at which the filament enters it by an electrical resistance heater coil. The zone within the tube and the resistance coil at the input end of the tube serves as a preheating zone, while the subsequent zone within the after section of the tube serves as the compensating zone for bringing the yarn temperature to the desired value, within substantially small limits. The resistance coil receives its electrical energy in regulated quantity from a suitable source of E.M.F., this quantity being regulated as by a thermostat as a feedback function of the temperature of the preheat zone in the tube. In order to achieve rapid raising of the temperature in the preheat zone, the volt-amps supplied to this zone during a call for more heat energy thereto is much higher than is necessary to maintain the desired equilibrium temperature in this zone. The electrical energy supplied to the subsequent compensating zone of the tube is separately similarly regulated as by a second thermostat disposed closely adjacent or preferably within a portion of the tube in the compensating zone. Thus, the temperature in the preheating zone may be regulated within fairly wide limits in view of the large quantity of heat energy imparted to the yarn in this zone, while the temperature of the tube and yarn in the compensating zone may be regulated within substantially smaller limits as a result of the consequent smaller quantity of heat energy which is required to be added to the tube and the yarn in the compensating zone in order to bring the temperature of the yarn up the remaining amount to the desired value after it leaves the preheating zone.

The invention will be more readily understood with reference to the accompanying diagrammatic drawings of one illustrative embodiment according to the invention, in which drawings:

FIGURE 1 is an overall schematic illustration of the device,

FIGURE 2 shows the temperature curve taken along the device of FIGURE 1, and

FIGURES 3 and 4 illustrate as a function of time the temperature curves taken respectively on the preheating element and on the compensating element, respectively.

In FIGURE 1, the numeral 11 represents an electrical resistance tube, the lower preheat zone portion A of which is surrounded by a heating element 13 in the form of an electrical resistance coil having feed terminals 15 and 17, and to the upper compensating zone portion B of which voltage is directly applied between the input terminal 19 and the output terminal 21. The electrical energy supply through 15 and 17 may be suitably regulated by a thermostat system including voltage regulator 23 and rheostat 24 having a detecting element 22 suitably disposed within a portion of the tube 11 in the preheat zone A and connected to voltage regulator 23, while the electrical energy supplied through the terminals 19 and 21

may be suitably regulated by a second thermostat system including voltage regulator **25** and rheostat **26** having a detecting element **27** disposed within a portion of the tube **11** in the compensating zone B and connected to voltage regulator **25**.

The yarn Y to be treated passes through the interior of the tube **11** in the direction of the arrow.

If, for example, the external ambient temperature is 20° C. and it is desired to treat the yarn Y at 220° C. in a single heating element, the quantity of calories to be supplied to the yarn, with a predetermined speed of the said yarn, would be a function of the difference: 220°—20°=200° C., taking into account the mass of the yarn passing through per unit time and the calorific capacity of the material of which the yarn consists.

In the system according to the invention, that is to say, comprising a combination of two complementary heating systems it is found, in the case of the above-mentioned example of a treatment at 220° C. and under the same conditions of speed of travel of the yarn, count and nature of the said yarn, that: the element **13**, if it is adjusted to effect a temperature of 210° C. in the pre-heat zone A, supplies a quantity of calories corresponding to: 210°—20°=190° C.

The element **11** itself then has to supply only the quantity of calories corresponding to 220°—210°=10° C.

Taking into account the fact that the regulated temperature of the element **13** is not precise and may vary, for example, from 205° to 215° C., the quantity of calories to be supplied by the element **11** in the compensating zone B will therefore have to vary, again taking into account the mass of the yarn and its calorific capacity, to effect a temperature change of from 5° to 15° C., in the zone B, which quantity is negligible in relation to the unavoidable losses through the insulation. For the instant example, assuming that approximately the same ratio of error or variance to required temperature change will prevail in the second zone B as in the initial preheat zone A, this temperature variation is between approximately +0.25° and —0.75° C.

$$\frac{\text{Temperature error}}{\text{Temperature change}} = \frac{10°}{200°} = \frac{x}{5°} \qquad x = +0.25° \text{ C.}$$

$$\frac{10°}{200°} = \frac{x}{-15°} \qquad x = -.75° \text{ C.}$$

On the other hand, if only the element **11** were used this temperature would have to vary by approximately 10° C.

The curves in FIGURES 2–4 correspond to and illustrate in general schematic form the approximate temperature curves according to the example taken above.

Although the invention has been described in detail in respect of a single preferred embodiment, it will be readily understood by those skilled in the art that the invention is capable of many modifications and improvements within the scope and spirit thereof. For instance, the tube **11** may be rectilinear or curved, or this or the other heating element may take other and different forms, and although the heating is described as electrical and such is preferred, other heat sources may be employed within the broad scope of the invention. Accordingly it will be understood that the invention is not to be limited by the specific disclosed embodiment but only by the scope and spirit of the appended claims.

That which is claimed is:

1. Yarn heat treating apparatus comprising an electrical resistance tube; a first terminal for electrical energy being connected to said tube at a location intermediate the entrance and exit ends of said tube; another terminal for electrical energy being connected to said tube at a location at the exit end of said tube, the portion of the tube defined by said terminals defining a compensating heating zone wherein yarn passed through the tube is treated at a temperature level approximating the desired temperature level for yarn treatment; a low thermal inertia electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube, said heating coil having a heating input capable of effecting a temperature very substantially higher than the desired temperature level for yarn treatment in the compensating heating zone in order that rapid temperature changes may be effected, but controlled to a level below said desired temperature level for yarn treatment; said heating coil and the compensating heating zone being independently and indivdually temperature regulated.

2. The yarn heat treating apparatus of claim 1 wherein the electrical resistance tube is a contact heater.

**References Cited** in the file of this patent
#### UNITED STATES PATENTS

| | | | |
|---|---|---|---|
| 2,434,351 | Wedler | Mar. 7, | 1944 |
| 2,803,105 | Stoddard et al. | Aug. 20, | 1957 |
| 2,807,863 | Schenker | Oct. 1, | 1957 |
| 2,820,280 | Benn | Jan. 21, | 1958 |
| 2,846,752 | Lessig | Aug. 12, | 1958 |
| 2,869,312 | Van Dijk | Jan. 20, | 1959 |
| 2,910,761 | Bley | Nov. 3, | 1959 |
| 3,015,872. | Jones | Jan. 9, | 1962 |

#### FOREIGN PATENTS

| | | | |
|---|---|---|---|
| 567,120 | Belgium | Oct. 25, | 1958 |

(Corresponding Great Britain Patent No. 850,080, September 28, 1960)

APPENDIX B

ALLOWED CLAIM 21 (PATENT CLAIM)
"READS ON" THIS HEATER

REJECTED CLAIM 17
"READS ON" THIS HEATER

17. Yarn heat treating apparatus comprising an electrical resistance tube, said tube being divided into a preheating zone and a compensating zone; the preheating zone being defined by a low thermal inertia electrical resistance heater coil completely surrounding the tube at the entrance end thereof, a source of electrical energy being connected to said heater coil at the respective ends thereof; the compensating zone being defined by two electrical leads connected to the tube, the first of said leads being connected to the tube at a location immediately adjacent to the heater coil, the other electrical lead being connected to the tube near the outlet end thereof; said heater coil and said compensating zone being individually temperature regulated, the heater coil having a heating input capable of effecting a temperature very substantially higher than the temperature in the compensating zone in order to effect a rapid temperature change.

21. Yarn heat treating apparatus comprising an electrical resistance tube; a first terminal for electrical energy being connected to said tube at a location intermediate the entrance and exit ends of said tube; another terminal for electrical energy being connected to said tube at a location at the exit end of said tube, the portion of the tube defined by said terminals defining a compensating heating zone wherein yarn passed through the tube is treated at a temperature level approximating the desired temperature level for yarn treatment; a low thermal inertia electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube, said heating coil having a heating input capable of effecting a temperature very substantially higher than the desired temperature level for yarn treatment in the compensating heating zone in order that rapid temperature changes may be effected, but controlled to a level below said desired temperature level for yarn treatment; said heating coil and the compensating heating zone being independently and individually temperature regulated.

**408**

APPENDIX C

FIG.1 OF '361 PATENT
( 2 ZONES)

EXTENDED COIL
(STILL 2 ZONES)

NO COIL BETWEEN ENTRANCE
AND 1ST TERMINAL
(ONLY ONE ZONE )

ACCUSED HEATER
(ONE ZONE)

APPENDIX D.

Aug. 20, 1957    N. J. STODDARD ET AL    2,803,105

APPARATUS FOR PROCESSING TEXTILE YARNS

Filed Jan. 4, 1954    5 Sheets—Sheet 2

FIG. 3

FIG. 5

FIG. 4

FIG. 2

FIG. 6

INVENTORS.
Nicholas J. Stoddard &
Warren A. Seem.
BY    Paul & Paul
ATTORNEYS